# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 17, 2013     Decided December 24, 2013

No. 12-5404

FADI AL MAQALEH, DETAINEE, AND AHMAD AL MAQALEH, AS
NEXT FRIEND OF FADI AL MAQALEH,
APPELLANTS

v.

CHUCK HAGEL, SECRETARY, UNITED STATES DEPARTMENT OF
DEFENSE, ET AL.,
APPELLEES

———

Consolidated with 12-5399, 12-5401

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:06-cv-01669)
(No. 1:08-cv-01307)
(No. 1:08-cv-02143)

———

No. 12-5407

AMANATULLAH, DETAINEE, AND ABDUL RAZAQ, AS NEXT
FRIEND TO AMANATULLAH,
APPELLANTS

v.

2

BARACK HUSSEIN OBAMA, PRESIDENT OF THE UNITED STATES,
ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00536)

————

No. 12-5410

HAMIDULLAH, DETAINEE, AND WAKEEL KHAN, AS NEXT
FRIEND TO HAMIDULLAH,
APPELLANTS

v.

BARACK HUSSEIN OBAMA, PRESIDENT OF THE UNITED STATES,
ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00758)

————

*Tina Monshipour Foster* argued the cause for appellants
Fadi Al Maqaleh, et al., in Nos. 12-5404, et al. *Golnaz
Fakhimi, Ramzi Kassem, Hope Metcalf* and *Sylvia Royce* were
on brief. *Barbara J. Olshansky* entered an appearance.

*Eric L. Lewis* argued the cause for appellants Amanatullah, et al., in No. 12-5407. *Tina Monshipour Foster*, *Golnaz Fakhimi* and *A. Katherine Toomey* were on brief.

*John J. Connolly* argued the cause for appellants Hamidullah, et al., in No. 12-5410. *William J. Murphy* and *Cori Crider* were on brief.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for the appellees. *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Douglas N. Letter*, Attorney, were on brief.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Over three years ago, we decided that enemy combatants held by the United States at Bagram Airfield Military Base (Bagram) in northwest Afghanistan could not invoke the Suspension Clause, U.S. CONST. art. I, § 9, cl. 2, to challenge their detentions. *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010) (*Al Maqaleh II*).   In these three appeals, Bagram detainees once again seek access to the writ of habeas corpus.  We once again dismiss their petitions for want of jurisdiction.

I

A.   Bagram and its Detainees

In the wake of the September 11, 2001 attacks on our homeland, the Congress authorized the President to "use all necessary and appropriate force against those nations,

organizations, or persons he determines planned, authorized, committed, or aided" the attacks. Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224, 224 (2001). Among the powers conferred on the President was the power to detain enemy combatants "for the duration of the particular conflict in which they were captured." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion); *id.* at 588–89 (Thomas, J., dissenting) (agreeing that AUMF authorizes detention); *see also Boumediene v. Bush*, 553 U.S. 723, 733 (2008); *Khairkhwa v. Obama*, 703 F.3d 547, 548 (D.C. Cir. 2012); *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011), *cert. denied* 132 S. Ct. 2739 (2012).[1] An enemy combatant is any person who, at the time of capture, was a part of the Taliban, al Qaeda or associated forces engaged in hostilities against the United States. *See Al-Madhwani v. Obama*, 642 F.3d 1071, 1073–74 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 2739 (2012); *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1814 (2011).

The United States has detained enemy combatants at facilities both within and outside the United States, including Bagram. Located in Parwan Province in northwest Afghanistan, Bagram is the largest U.S. military installation in that country. *Al Maqaleh II*, 605 F.3d at 87. U.S. and allied forces conduct operations from Bagram. The current lease agreement between the United States and Afghanistan provides that the United States may occupy and use Bagram "for military purposes . . . until the United States or its

---

[1] The Congress recently affirmed the President's authority to detain enemy combatants. *See* Fiscal Year 2012 National Defense Authorization Act, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) (codified at 10 U.S.C. § 801 note (2012)).

successors determine that the premises are no longer required for its use." *Id.* (quotations marks omitted).

Among those detained at Bagram are the five appellants in this case (to whom we refer collectively as the Appellants). Three of the Appellants—Fadi al-Maqaleh, Amin al-Bakri and Redha al-Najar—were appellees in *Al Maqaleh II* (we refer to them collectively as the *Al Maqaleh II* Appellants). Appellant al-Maqaleh is a Yemeni citizen who alleges that the United States captured him outside Afghanistan and transferred him to Bagram in 2004 or 2005. Appellant al-Bakri is a Yemeni citizen who alleges that the United States captured him in Thailand in 2002 and eventually transferred him to Bagram. Appellant al-Najar is a Tunisian citizen who alleges he was captured in Pakistan in 2002 and subsequently transferred to Bagram. Appellant Amanatullah is a Pakistani citizen who was captured by British forces in Iraq in 2004 or 2005 and subsequently transferred to Bagram. Appellant Hamidullah is a Pakistani citizen who alleges that he was captured in the Pakistani border region of South Waziristan in 2008 at the age of fourteen and subsequently detained at Bagram.

Before *Al Maqaleh II*, the United States housed detainees within the confines of Bagram at the Bagram Theater Internment Facility (BTIF). In late 2009, however, the United States constructed a new detention facility, then known as the Detention Facility in Parwan (DFIP), just outside Bagram. The United States transferred all Afghan detainees held in the BTIF to the DFIP by late 2009. Adjacent to the DFIP, the United States built a separate facility to house non-Afghan detainees. In May 2012, the United States agreed to transfer both "U.S. detention facilities in Afghan territory to Afghan control" and "Afghan nationals detained by U.S. forces at the [DFIP] to Afghanistan." Memo. of Understanding on Transfer of U.S. Detention Facilities in Afghan Territory to

Afghanistan, U.S.-Afg., § 2, Mar. 9, 2012, Joint Appendix (JA) 680 (2012 MOU). The United States completed the transfer of the DFIP facility and its inmates to Afghan control on March 25, 2013. John Kerry, Remarks with President Hamid Karzai After Their Meeting (Mar. 25, 2013), *available at* http://www.state.gov/secretary/remarks/2013/03/206663. htm; Press Release, International Assistance Security Force, North Atlantic Treaty Organization, U.S. Transitions Parwan Detention Facility to Afghan Government (Mar. 25, 2013), *available at* http://www.isaf.nato.int/article/isaf-releases/u.s.-transitions-parwan-detention-facility-to-afghan-government.ht ml. The DFIP—now known as the Afghan National Detention Facility-Parwan—is a part of the Justice Center in Parwan (JCIP), where the Afghan government conducts criminal trials of Afghan detainees.

We note that the Appellants' current status is unclear. Although the Government represented in May 2011 that it detained them at the DFIP, it has since ceded the DFIP to Afghan control. The record does not disclose whether, after that cession, the Appellants remain there or at some other facility and the Government has not informed us of the Appellants' current location. The Appellants claim in their briefs—filed after the transfer of the DFIP to Afghan control—that the United States continues to detain them at "a separate prison facility at Bagram." Joint Br. for Pet'rs-Appellants (al-Maqaleh Br.) 38, *Al Maqaleh v. Gates*, Nos. 12-5404, 12-5399, 12-5401 (D.C. Cir. April 27, 2013). Because the Government concedes its continuing custody over four of the five Appellants, we accept the Appellants' alleged location of their detention as accurate for the purpose of our jurisdictional analysis.

## B.   Legal Framework

In 2006, the Congress enacted the Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-366, 120 Stat. 2600.  It provides, in pertinent part, that

> [n]o court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination . . . pending on or after the date of the enactment of this Act . . . .

*Id.* § 7(a), (b), 120 Stat. at 2635–36 (codified at 28 U.S.C. § 2241(e)(1) (2006)).  We held that section 7 stripped the court of jurisdiction to consider any habeas petition filed by any alien detained as an enemy combatant outside the United States. *Boumediene v. Bush*, 476 F.3d 981, 986–88 (D.C. Cir. 2007).  Relying on the United States Supreme Court's decision in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), we further concluded that section 7 did not unconstitutionally suspend the writ because the Suspension Clause's protections did not reach the United States Naval Station Guantanamo Bay (Guantanamo) in Cuba. *Id.* at 990–94.  In *Eisentrager*, German citizens detained by the United States at Landsberg Prison in post-World War II Bavaria petitioned for writs of habeas corpus. 339 U.S. at 765–66.  The Supreme Court held that the constitutional right to the writ of habeas corpus did not extend to the German prisoners. *Id.* at 781.  Our *Boumediene* decision read *Eisentrager* to hold that the protections of the Suspension Clause did not extend to aliens held outside the sovereign territory of the United States, including Guantanamo. *Boumediene*, 476 F.3d at 990–92.

The Supreme Court reversed. *Boumediene v. Bush*, 553 U.S. 723 (2008). It rejected the "premise that *de jure* sovereignty is the touchstone of habeas jurisdiction." *Id.* at 755; *see also id.* at 764 ("Nothing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus."). Instead, construing *Eisentrager* in light of the *Insular Cases*[2] and *Reid v. Covert*, 354 U.S. 1 (1957), the Supreme Court identified "a common thread uniting" its extraterritoriality jurisprudence, to wit, that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Boumediene*, 553 U.S. at 764. It identified

> at least three factors . . . relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

*Id.* at 766. Applying the factors to the detainees at Guantanamo, the Supreme Court concluded that the Suspension Clause extended to Guantanamo and therefore the Guantanamo detainees had a constitutional right to challenge

---

[2] The *Insular Cases* were a series of cases addressing the reach of the Constitution to U.S. territories located in the Caribbean and the Pacific. *See, e.g.*, *Balzac v. Porto Rico*, 258 U.S. 298 (1922); *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii v. Mankichi*, 190 U.S. 197 (1903); *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901).

the basis of their detention. *Id.* at 766–71. Because the existing procedures did not afford them an adequate opportunity to challenge their detentions, the Supreme Court held that section 7 of the 2006 MCA is an unconstitutional suspension of the writ at Guantanamo. *Id.* at 792.

### C. Litigation History

The *Al Maqaleh II* Appellants petitioned the district court for writs of habeas corpus.[3] Applying the three *Boumediene* factors, the district court concluded that the *Al Maqaleh II* Appellants were "virtually identical to the detainees in *Boumediene*" and held that section 7 of the 2006 MCA unconstitutionally suspended the writ at Bagram. *Al Maqaleh v. Gates*, 604 F. Supp. 2d 205, 208–09 (D.D.C. 2009) (*Al Maqaleh I*). We reversed, holding that significant differences between Bagram and Guantanamo as well as the practical difficulties posed by adjudicating habeas petitions in a war zone barred extension of the Suspension Clause to Bagram. *Al Maqaleh II*, 605 F.3d at 97–99. Shortly after our ruling, the *Al Maqaleh II* Appellants sought rehearing on the basis of new evidence which they claimed undermined our decision. We denied the petition "without prejudice to appellees' ability to present this evidence to the district court in the first instance." Order, *Al Maqaleh II*, No. 09-5265 (D.C. Cir. July 23, 2011) (per curiam).

The Appellants then filed amended habeas petitions in district court. The *Al Maqaleh II* Appellants argued that changed circumstances relevantly distinguished their new

---

[3] Appellant al-Maqaleh filed his petition before the Supreme Court's *Boumediene* decision and Appellants al-Bakri and al-Najar filed their petitions after *Boumediene* issued. The respondents in this case include the President, the Secretary of Defense (Secretary) and several John and Jane Does.

petitions from those rejected in *Al Maqaleh II*. They claimed that new evidence indicated that the United States intended to remain at Bagram indefinitely; that obstacles to conducting habeas proceedings were less severe than the *Al Maqaleh II* court believed; that the United States detained them at Bagram in order to evade the habeas jurisdiction of federal courts; and that the propriety-of-detention determination procedures used at Bagram were inadequate. *Al Maqaleh v. Gates*, 899 F. Supp. 2d 10, 16 (D.D.C. 2012) (*Al Maqaleh III*). In a thorough opinion, the district court dismissed the petitions, concluding that the new evidence did not alter the holding of *Al Maqaleh II*. *Id.* at 16–25. Appellant Amanatullah raised nearly identical arguments in his petition and they were rejected for largely the same reasons. *Amanatullah v. Obama*, 904 F. Supp. 2d 45, 49–57 (D.D.C. 2012). Appellant Hamidullah argued that his infancy at the time of his capture weighed in favor of extending the writ. *Hamidullah v. Obama*, 899 F. Supp. 2d 3, 5–6 (D.D.C. 2012). The district court rejected this argument as insufficient to overcome the fact that Bagram is situated within a war zone. *Id.* at 10. The Appellants timely appealed.

## II

### A.   Standard of Review

We review *de novo* the dismissal of a habeas petition for want of jurisdiction. *Al Maqaleh II*, 605 F.3d at 94; *see also United States v. Poole*, 531 F.3d 263, 270 (4th Cir. 2008); *Wang v. Ashcroft*, 320 F.3d 130, 139–40 (2d Cir. 2003). Although we accept the allegations in the petition as true when reviewing a motion to dismiss for lack of jurisdiction, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), that formulation does not accurately account for the full scope of our review. If the allegations upon which jurisdiction rests

are challenged, the district court may resolve the dispute and consider its resolution of any disputed facts alongside the petitioner's undisputed allegations. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197–98 (D.C. Cir. 1992); *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 n.3 (D.C. Cir. 1997); 5B CHARLES ALAN WRIGHT & ARTHUR P. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 160 n.47 (3d ed. 2004) (collecting cases). We review the district court's resolution of factual disputes for clear error. *Herbert*, 974 F.2d at 198.

We have already decided that we do not have habeas jurisdiction at Bagram, *see Al Maqaleh II*, 605 F.3d 84, and the law-of-the-circuit doctrine requires that we adhere to that decision, *see In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) ("The law-of-the-circuit doctrine means that 'the *same issue* presented in a *later case* in the *same court* should lead to the *same result*' and that '[o]ne three judge panel . . . does not have the authority to overrule another three-judge panel of the court.'" (emphasis in original) (quoting *LaShawn v. Barry*, 87 F.3d 1389, 1393, 1395 (D.C. Cir. 1996) (en banc))). Our task, therefore, is a modest one: to determine whether the circumstances underlying *Al Maqaleh II* have changed so drastically that we must revisit it.[4]

---

[4] Our review of the *Al Maqaleh II* Appellants' appeal is further constrained both by the law-of-the-case doctrine, *see Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("The law-of-the-case doctrine rests on a simple premise: the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." (quotation marks omitted)), and by the derivative-waiver doctrine, *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("A legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the

B.   Mootness

Events subsequent to oral argument require us to determine whether Appellant Hamidullah's appeal is moot. On November 16, 2013, the United States transferred Hamidullah to the custody of the government of Pakistan. After learning of the transfer, we ordered the parties to brief the mootness question.   Having reviewed the briefs, we conclude that the parties' factual dispute regarding the nature of Pakistan's custody over Hamidullah must be resolved by the district court in the first instance.

Under Article III of the Constitution, we have authority to adjudicate only live cases or controversies. *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013).   "A case remains live '[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation.' " *United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. & Can.*, 721 F.3d 678, 687 (D.C. Cir. 2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)).   This " 'requirement subsists through all stages of federal judicial proceedings, trial and appellate.   It is not enough that a dispute was very much alive when suit was filed'; the parties must 'continue to have a personal stake' in the ultimate disposition of the lawsuit." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)) (quotation marks, brackets and citation omitted); *see also Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974).

opportunity to do so existed, governs future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." (quotation marks and brackets omitted)).

We have previously addressed the effect of a detainee's release on his pending habeas petition. In *Gul v. Obama*, two aliens detained as enemy combatants filed habeas petitions challenging their detentions. 652 F.3d 12, 14 (D.C. Cir. 2011). During the pendency of their petitions, the United States released them to the custody of foreign governments. *Id.* They argued that their petitions were not moot, however, because they continued to suffer "collateral consequences" arising from their designation as enemy combatants. *Id.* at 15. Under the collateral consequences doctrine, a prisoner's habeas petition challenging the legality of his conviction becomes moot upon the expiration of his sentence unless he can show that he continues to suffer some continuing harm, or "collateral consequence," from his conviction. *United States v. Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (citing *Spencer v. Kemna*, 523 U.S. 1, 7–8 (1998); *see also Carafas v. LaVallee*, 391 U.S. 234, 237–38 (1968) (announcing collateral consequences doctrine). Assuming without deciding that the collateral consequences doctrine applied, we held that the petitioners' alleged collateral consequences— travel restrictions, ongoing danger of recapture under the laws of war and stigma—were insufficient to save their petitions from mootness. *Id.* at 18–21.

As in *Gul*, the Government has submitted a declaration explaining that, when it transferred Hamidullah, it "relinquish[ed] all legal and physical custody and control" over him to the government of Pakistan. Supplemental Br. for Resp'ts-Appellees, Ex. 1, Decl. of Paul Lewis, Special Envoy for Detainee Transfers ¶ 3, *Hamidullah v. Obama*, No. 12-5410 (D.C. Cir. Nov. 27, 2013) (Lewis Declaration). The Government therefore contends that he is identically situated to the petitioners in *Gul* and his appeal must be dismissed. Hamidullah contests the Lewis Declaration, arguing that we must remand to the district court to determine whether "the

United States has imposed transfer terms and conditions that create[] a form of constructive United States custody after transfer." Supplemental Br. of Appellants 7–8, *Hamidullah v. Obama*, No. 12-5410 (D.C. Cir. Nov. 27, 2013) (emphasis omitted).

Although in *Gul* we credited the Government's declaration that it transferred both petitioners "entirely to the custody and control of the receiving government," *Gul*, 652 F.3d at 18 (quotation marks and brackets omitted), the district court first examined those declarations and credited them over the petitioners' contrary allegations, *In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 127–29 (D.D.C. 2010). In this appeal, however, we lack the benefit of the district court's examination of the evidence in the first instance. We think it unwise to decide our jurisdiction when it turns in part on unresolved factual questions. *See Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80, 1183 (D.C. Cir. 1984); *Marshall v. Local Union No. 639, Int'l Bhd. of Teamsters*, 593 F.2d 1297, 1301 (D.C. Cir. 1979); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). We therefore remand Hamidullah's petition to the district court for the limited purpose of determining whether he is in the sole custody of the government of Pakistan.[5]

---

[5] We do not mean to say that the Lewis Declaration is insufficient to settle the mootness question. Hamidullah bears the burden of adducing facts sufficient to show that his case is not moot. *Gul*, 652 F.3d at 21 (quoting *Spencer*, 523 U.S. at 11); *see also McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936) (Hughes, C.J.) ("[The plaintiff] must allege in his pleading the facts essential to show jurisdiction."). If the district

III

To decide whether the Appellants have any right under the Suspension Clause, we apply *Boumediene*'s three-factor test. We address each factor in turn.[6]

## A. Citizenship and Status

We first consider the "citizenship and status" of the Appellants. In *Boumediene*, the petitioners were "aliens designated as enemy combatants and detained" by the United States but they disputed that designation. *See Boumediene*, 553 U.S. at 732, 766. The appellants in *Al Maqaleh II* were identically situated and we held that this prong of the first factor weighed in favor of extending the protection of the Suspension Clause to Bagram. *Al Maqaleh II*, 605 F.3d at 96. The Appellants now argue, however, that their citizenship and status distinguish them from *Boumediene* and *Al Maqaleh II* such that this prong now supports their argument for extension of the Suspension Clause more strongly than before. Their arguments require us to define the meaning of "citizenship and status" under *Boumediene*.

Like the *Boumediene* petitioners and the *Al Maqaleh II* appellees, the Appellants in these appeals are aliens detained

---

court determines that Hamidullah's evidence fails to impugn the Lewis Declaration's accuracy, we believe that declaration would suffice to establish that Pakistan is not detaining Hamidullah on the United States's behalf. *See Gul*, 652 F.3d at 18 & n.*; *Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509, 515 n.7 (D.C. Cir. 2009).

[6] Both *Boumediene* and *Al Maqaleh II* treat the "citizenship and status" and "adequacy of the process" prongs of the first factor as analytically distinct and therefore we do as well.

as enemy combatants.[7]  Appellant Amanatullah contends that, although he is an alien, his Pakistani citizenship is relevant because, as a Pakistani citizen, he is not a citizen of an enemy nation.  His specific alien citizenship is not relevant, however, because the only relevant citizenship under *Boumediene* is American citizenship.  In *Boumediene* all of the petitioners were "foreign nationals, but none [was] a citizen of a nation [then] at war with the United States." *Boumediene*, 553 U.S. at 734.  The Court accorded this observation no weight. Instead, it focused on the fact that the "[p]etitioners, like those in *Eisentrager*, [we]re not American citizens." *Boumediene*, 553 U.S. at 766.  *Al Maqaleh II* also focused exclusively on whether the detainees were U.S. citizens or aliens.  It elucidated the analytical significance of the "citizenship" prong by referencing the settled authority according U.S. citizens more robust constitutional protections than nonresident aliens. *Al Maqaleh II*, 605 F.3d at 95–96 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)).  But the applicability of constitutional protections has never turned on the specific citizenship of an alien; *ceteris paribus*, a nonresident Briton is no more entitled to invoke the

---

[7] At the outset, we note that the Supreme Court did not explain the significance of a detainee's alienage or enemy-combatant designation.  Although we held in *Al Maqaleh II* that the petitioners' citizenship and status weighed in favor of extending the Suspension Clause, *Boumediene* did not so hold.  *Boumediene* held only that the petitioners' challenge to the Government's designation put them in a stronger position than the *Eisentrager* petitioners, who apparently did not "contest . . . the Court's assertion that they were enemy aliens." *Boumediene*, 553 U.S. at 766 (quotation marks and brackets omitted). We need not decide whether some status other than "enemy combatant" would affect the *Boumediene* analysis because we conclude that the Appellants are identically situated to the petitioners in *Boumediene*.

rights of the Constitution than a nonresident Pakistani. We therefore conclude that "citizenship" under *Boumediene* asks only whether the detainee is a U.S. citizen or an alien. Because Appellant Amanatullah is an alien, this prong weighs no more in his favor than it did for the detainees in *Boumediene* and *Al Maqaleh II*.[8]

Although the Appellants are designated as enemy combatants, they argue that characteristics other than the designation are relevant to the "status" prong of the first *Boumediene* factor. In so arguing, the Appellants sorely misread *Boumediene*. "Status" does not refer to a detainee's individual characteristics but instead to the designation

---

[8] Amanatullah's argument might carry more weight if the basis of his detention were his citizenship. Under the Alien Enemy Act, Act of July 6, 1798, ch. 66, § 1, 1 Stat. 577 (codified at 50 U.S.C. § 21 (2006)), the President may summarily detain any person who is a citizen of a nation with which the United States is at war. *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952); *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948); *Brown v. United States*, 12 U.S. (8 Cranch) 110, 126 (1814) (Marshall, C.J.) (stating that Alien Enemy Act "confers on the president very great discretionary powers respecting [alien enemies'] persons"); *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). Under the AUMF, however, the President may detain only "enemy combatants"—those persons the President determines are part of a force engaged in hostilities against the United States. This power is at once both broader and narrower than the power conferred on the President by the Alien Enemy Act: it is not limited to any particular citizenship but mere citizenship does not justify detention. The distinction results from the nature of the current conflict. Our enemies fly no flag, don no uniforms, bear no allegiance to any state and hale from every corner of the globe. They put no stock in Westphalian notions of sovereignty or citizenship; the AUMF simply authorizes the President to meet the threat on our enemies' terms.

justifying his detention. The *Boumediene* court had to "determine whether petitioners are barred from seeking the writ or invoking the protections of the Suspension Clause . . . because of their status, *i.e.*, petitioners' *designation* by the Executive Branch *as enemy combatants*." *Id.* at 739 (emphasis added). Similarly, the second prong of the first factor is the "adequacy of the process through which that *status determination* was made." *Id.* at 769 (emphasis added). The Supreme Court's language makes clear that "status" does not include the detainees' personal characteristics but is instead the label, or designation, placed on the detainee by the President to justify the detainee's detention.

Applying this definition of "status" to the Appellants' arguments, we conclude that the Appellants are identically situated to the *Boumediene* and *Al Maqaleh II* petitioners. The Appellants allege that a Detainee Review Board (DRB)— a military tribunal periodically convened to determine a detainee's status at Bagram—has cleared each of them for release from Bagram and that this "status" weighs in their favor. But the Government's justification for detaining the Appellants is unchanged: they remain designated as enemy combatants. Because eligibility for release "is irrelevant to whether a petitioner may be detained lawfully," including when our inquiry is into the propriety of the Government's status designation, we do not consider it as part of our jurisdictional inquiry. *Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011) (citing *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1814 (2011)), *cert. denied*, 132 S. Ct. 2739 (2012).

Appellant Amanatullah separately contends that his "actual status" entitles him to release. His argument is more invective than substance but insofar as we apprehend it, he appears to contend that the Suspension Clause must extend to him because the United States has failed to prove that his

detention is lawful. Alternatively, he argues that he is at least entitled to jurisdictional discovery in order to ascertain the basis of his detention. We reject Appellant Amanatullah's argument not only because it is irrelevant under *Boumediene* but also because it commits the fallacy of *petitio principii*. Every habeas petition disputes the lawfulness of detention; that dispute is the quintessence of habeas corpus. *Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("Habeas is at its core a remedy for unlawful executive detention."); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention . . . ."). While we may not assess the lawfulness of detention unless we have jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998), we "always have jurisdiction to determine [our] own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 291 (1947)). Appellant Amanatullah's proposal is little more than an end run around the jurisdictional inquiry: if our jurisdiction turns on the lawfulness of detention, we will *always* resolve that question because we always have authority to decide our jurisdiction. Eliding the lawfulness of detention with the extraterritoriality inquiry would eliminate the need for an independent jurisdictional inquiry and result in universal habeas jurisdiction. We unequivocally reject any argument espousing the universal extraterritorial application of the Suspension Clause. *Al Maqaleh II*, 605 F.3d at 95.[9]

---

[9] We also reject the Appellants' argument that, because they were not captured in places where the United States is currently at war, their detention is not necessary to prevent their return to the battlefield (because it either never existed or no longer exists). In addition to the reasons already discussed, we reject the argument because the *Boumediene* and *Al Maqaleh II* petitioners were captured in places in which the United States was not at war and

We similarly deny Appellant Amanatullah's request for jurisdictional discovery to uncover the factual basis for his detention. The district court has discretion to allow discovery if it "could produce [facts] that would affect [its] jurisdictional analysis." *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994). Denying discovery in the absence of some "specific indication . . . regarding 'what facts additional discovery could produce that would affect the court's jurisdictional analysis' " is a proper exercise of that discretion. *Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009) (brackets omitted) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005)); *see also* Rules Governing Section 2254 and 2255 Cases in the U.S. District Courts, R. 6(a), 28 U.S.C. foll. § 2254 (2006 & Supp. III 2010) (discovery permitted in habeas proceedings for good cause shown); *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (discussing discovery standard under the Rules); *Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C. Cir. 2007) (stating that the Rules apply to section 2241 proceedings pursuant to Rule 1(b)). Discovery regarding the lawfulness of Appellant Amanatullah's detention cannot advance our jurisdictional inquiry because it is irrelevant to that inquiry. The district court therefore did not abuse its discretion in denying discovery on that question. *See United States v. Gale*, 314 F.3d 1, 6 (D.C. Cir. 2003) (citing *Bracy*,

---

that fact played no role in either court's analysis. *See Al Maqaleh II*, 605 F.3d at 87 (noting that petitioners were captured in Pakistan and Thailand); *Khalid v. Bush*, 355 F. Supp. 2d 311, 316 (D.D.C. 2005) (noting that some *Boumediene* petitioners were captured in Bosnia and Pakistan); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 446 (D.D.C. 2005) (noting that other *Boumediene* petitioners were captured in Gambia, Zambia, Bosnia and Thailand).

520 U.S. at 909) (holding that denial of discovery in habeas proceedings is reviewed for abuse of discretion).

## B. Adequacy of the Process

We next consider "the adequacy of the process through which that status determination was made." *Boumediene*, 553 U.S. at 766. At the time of *Boumediene*, Combatant Status Review Tribunals (CSRTs) were used pursuant to the Secretary's order to determine whether Guantanamo detainees were properly designated as enemy combatants. *Boumediene*, 553 U.S. at 733; *see also* Memorandum from Paul Wolfowitz, Deputy Secretary of Defense, Re Order Establishing Combatant Status Tribunal, to the Secretary of the Navy (July 7, 2004), *available at* http://www.defense.gov/news/jul2004/d20040707review.pdf. The Supreme Court concluded that the use of CSRTs to determine a detainee's status weighed in favor of extending the Suspension Clause because they "[we]re far more limited, and . . . f[e]ll well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 767. This reasoning is the same used by the Court to determine whether the CSRTs violated the Suspension Clause after it decided that the Suspension Clause applied and is thus slightly circular—an alien detained abroad is more likely to have a right under the Suspension Clause if the United States is violating his Suspension Clause right. We distill from the Supreme Court's discussion the following principle: the less closely a propriety-of-detention determination resembles traditional habeas review, the more likely the Suspension Clause applies.

In *Al Maqaleh II*, Unlawful Enemy Combatant Review Boards (UECRBs) created by order of the Secretary of Defense had determined the status of Bagram detainees. We held that because the UECRB afforded "even less protection

to the rights of detainees in the determination of status than was the case with the CSRT," this prong weighed in favor of extending the Suspension Clause to Bagram detainees. *Al Maqaleh II*, 605 F.3d at 96. In other words, because UECRB procedures resembled traditional habeas procedures less than did the CSRT procedures in *Boumediene*, the "adequacy of process" prong weighed more heavily in favor of extending the Suspension Clause to Bagram. *Id.* After *Al Maqaleh I*, the Defense Department replaced the UECRB with the DRB. We declined to consider the DRB procedures in *Al Maqaleh II*, however, because no DRB had yet determined the status of each of the *Al Maqaleh II* appellees. *Id.* at 96 n.4. Here, however, separate DRBs have determined the status of each Appellant so we now consider the adequacy of those procedures.

The Appellants argue that the DRB procedures are still insufficient substitutes for habeas review and provide fewer protections than the CSRT did. Whatever the *CSRTs*' protections may have been, the DRB procedures are undoubtedly more akin to traditional habeas proceedings than were the *UECRB* procedures. The Appellants conceded as much in district court. *See Al Maqaleh III*, 899 F. Supp. 2d at 24. For example, detainees are now entitled to a personal representative and may call witnesses, proffer evidence and investigate potentially exculpatory information, none of which the UECRBs permitted. Even if the DRB still falls short of the CSRT procedures, they more closely resemble habeas review than the UECRB procedures. Accordingly, this factor weighs less in the Appellants' favor than it did in *Al Maqaleh II*.[10]

_____

[10] The *Al Maqaleh II* Appellants complain that even if the DRB procedures are facially more favorable to the detainees, the Government's application of those procedures effectively leaves the

## C.  The "Nature" of Bagram

The second factor in the *Boumediene* analysis is "the nature of the sites where apprehension and then detention took place." *Boumediene*, 553 U.S. at 766.  *Boumediene* held that Guantanamo's location outside the United States, like Landsberg Prison's location, weighed against extending the Suspension Clause there. *Id.* at 768.   But, unlike at Guantanamo, U.S. control at Landsberg "was neither absolute nor indefinite." *Id.*   The United States answered to its Allies for its administration of Landsberg. *Id.*   By contrast, "the United States is . . . answerable to no other sovereign for its acts" at Guantanamo. *Id.* at 770.  Moreover, the United States did not plan a long-term occupation of Germany, meaning the United States's control over Landsberg was only temporary. *Id.* at 768.   "Guantanamo Bay, on the other hand, is no transient possession. In every practical sense Guantanamo is

---

UECRBs intact.   Specifically, they assert that, although DRB procedures afford detainees an opportunity to call witnesses, *they* have been denied that opportunity.   They cite as evidence their counsel's declaration that the Department of Defense denied her the opportunity to testify before a DRB either by telephone or in person.   The Government disputed this claim in district court and submitted an affidavit from a Defense Department official declaring that the United States denied the *Al Maqaleh II* Appellants' submitted request to have their counsel testify in person but did not deny them the opportunity to have their counsel testify by telephone.   When the *Al Maqaleh II* Appellants learned that their counsel could not testify in person, they refused to participate in the proceedings and informed their personal representative that they did not want their counsel to testify by telephone.   The district court resolved this factual dispute in the Government's favor, *see Al Maqaleh III*, 899 F. Supp. 2d at 25, and we perceive no error, much less clear error, in its resolution, *see Herbert*, 974 F.2d at 198.

not abroad; it is within the constant jurisdiction of the United States." *Id.* at 768–69.

In *Al Maqaleh II*, we concluded that Bagram is far more similar to Landsberg than to Guantanamo. We explained:

> While it is true that the United States holds a leasehold interest in Bagram, and held a leasehold interest in Guantanamo, the surrounding circumstances are hardly the same. The United States has maintained its total control of Guantanamo Bay for over a century, even in the face of a hostile government maintaining *de jure* sovereignty over the property. In Bagram, while the United States has options as to duration of the lease agreement, there is no indication of any intent to occupy the base with permanence, nor is there hostility on the part of the "host" country. Therefore, the notion that *de facto* sovereignty extends to Bagram is no more real than would have been the same claim with respect to Landsberg in the *Eisentrager* case.

*Al Maqaleh II*, 605 F.3d at 97.

The Appellants argue that *Al Maqaleh II* no longer controls our analysis because new evidence demonstrates that the United States now intends to permanently occupy Bagram. Although their argument is exceptionally difficult to parse, the Appellants appear to contend that (1) the transfer of Afghan prisoners, but not the Appellants, to Afghan custody suggests that the United States intends to permanently hold them; (2) because the war undertaken pursuant to the AUMF may continue in perpetuity, and in any event far beyond the end of U.S. operations in Afghanistan, the United States intends to detain the Appellants indefinitely; and, (3) a new agreement between the United States and Afghanistan

indicates that the United States will remain in Afghanistan indefinitely.

The Appellants misapprehend the import of the second factor; it calls for an examination of the extent of control over the physical situs of detention and the permanence of that control. *Boumediene*, 553 U.S. at 768; *Al Maqaleh II*, 605 F.3d at 96–97. The indefiniteness of the United States's control over the place of detention, not over the prisoners, is the relevant issue. Whether the United States asserts authority to detain the Appellants indefinitely under the AUMF is relevant only if evidence demonstrates that the United States intends to do so at Bagram. As we explain below, no such evidence exists.

The Government in *Al Maqaleh II* represented that it had no intention of remaining in Afghanistan permanently or of establishing a permanent base or prison at Bagram. We took the Government at its word. *Al Maqaleh II*, 605 F.3d at 97. Subsequent events have confirmed, not undermined, the Government's declared intention. The 2012 MOU provided for the eventual transfer of all Afghan detainees and U.S. detention facilities to Afghanistan. The United States has delivered on its promise, transferring both the DFIP and all Afghan detainees to Afghanistan earlier this year. DEP'T OF DEFENSE, PROGRESS TOWARD SECURITY AND STABILITY IN AFGHANISTAN 139–40 (July 2013), *available at* http://www.defense.gov/pubs/Section_1230_Report_July_2013.pdf. The United States also recently transferred one of the Appellants in these appeals to his home country. *See supra* Section II.B. Moreover, the United States and Afghanistan recently entered into an agreement in which Afghanistan promised to "provide U.S. forces continued access to and use of Afghan facilities through 2014" while the United States "reaffirmed that it does not seek permanent military facilities

in Afghanistan." Enduring Strategic Partnership Agreement (ESPA), art. III, ¶ 6, U.S.-Afg., May 2, 2012, JA 747.

We do not suggest that this evidence affirmatively establishes that the United States will transfer control of Bagram by the end of 2014 nor does our decision rest on the assumption that such a transfer will occur in 2014 or at any other specific future date. The year 2014 is not a "sell by" date after which this factor weighs in the Appellants' favor. We view this evidence merely as support for the conclusion we reached in *Al Maqaleh II* that American control over Bagram and its detention facilities lacks the permanence of U.S. control over Guantanamo. *See Al Maqaleh II*, 605 F.3d at 97.

The Appellants nevertheless contend that the ESPA suggests that the United States intends to remain at Bagram permanently. They argue that the ESPA "contemplates that the US [sic] will maintain a military presence in Afghanistan through *at least* 2024." al-Maqaleh Br. 38 (emphasis in original). We reject the Appellants' disingenuous reading of the ESPA. The only reference to the year 2024 in that document is the provision that the ESPA "shall remain in force until the end of 2024." ESPA, art. VII, ¶ 1, JA 752. Although the ESPA contemplates that a Bilateral Security Agreement may permit U.S. forces to remain in Afghanistan after 2014, nothing in the ESPA so provides.[11]  Accordingly,

---

[11] We are aware that a recently released draft of the Bilateral Security Agreement grants the United States authority to maintain a military facility at Bagram beyond 2014. We can only guess whether the agreement will ever enter into force so it does not alter our analysis. *See Tim Craig & Karen DeYoung*, *Security Pact with Afghans Cast into Doubt*, WASH. POST, Nov. 26, 2013, at A1 (documenting significant obstacles to finalization of agreement).

the ESPA gives us "no indication of any intent to occupy the base with permanence." *Al Maqaleh II*, 605 F.3d at 97.

### D.   Practical Obstacles

### 1

Finally, we examine "the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Boumediene*, 553 U.S. at 766.  In *Boumediene*, the Court explained the significance of this factor by reference to the facts of *Eisentrager*:

> When hostilities in the European Theater came to an end, the United States became responsible for an occupation zone encompassing over 57,000 square miles with a population of 18 million. In addition to supervising massive reconstruction and aid efforts the American forces stationed in Germany faced potential security threats from a defeated enemy. In retrospect the post-War occupation may seem uneventful. But at the time *Eisentrager* was decided, the Court was right to be concerned about judicial interference with the military's efforts to contain "enemy elements, guerilla fighters, and 'werewolves.' "

*Id.* at 769–70 (citations omitted) (quoting *Eisentrager*, 339 U.S. at 784).[12]   "[C]ontain[ing] enemy elements, guerilla fighters, and werewolves," however, was not the *Eisentrager* Court's only concern:

---

[12] The "werewolves" noted in *Eisentrager* reference a nascent guerrilla operation planned by the Nazis to resist Allied occupation of Germany. *See generally* PERRY BIDDISCOMBE, WERWOLF!: THE HISTORY OF THE NATIONAL SOCIALIST GUERRILLA MOVEMENT, 1944–1946 (1998).

The writ, since it is held to be a matter of right, would be equally available to enemies during active hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779. In *Boumediene*, the Supreme Court found no "[s]imilar threats . . . apparent" in adjudicating habeas petitions arising from Guantanamo. *Boumediene*, 553 U.S. at 770. Unlike in *Eisentrager*, "[t]he Government present[ed] no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims." *Id.* at 769. Moreover, "[t]here [was] no indication . . . that adjudicating a habeas corpus petition would cause friction with the host government." *Id.* at 770.

In *Al Maqaleh II*, we concluded that the circumstances at Bagram compelled an opposite conclusion. Emphasizing *Boumediene*'s suggestion that its outcome may have been different " 'if the detention facility were located in an active theater of war,' " *Al Maqaleh II*, 605 F.3d at 98 (emphasis omitted) (quoting *Boumediene*, 553 U.S. at 770), we held that the practical concerns identified in *Eisentrager* "are more relevant to the situation at Bagram than they were at

Landsberg" such that this factor "weigh[ed] overwhelmingly in favor of the position of the United States," *id.* at 97, 98. Whereas Landsberg Prison stood within the land of a defeated enemy, "Bagram remains in a theater of war" against a formidable and determined foe. *Id.* at 98. If the adjudication of habeas petitions would have interfered with the occupation of a pacified country, *a fortiori* habeas proceedings would interfere with combat operations on the battlefield. Finally, unlike at Guantanamo, "[t]he United States holds the detainees pursuant to a cooperative arrangement with Afghanistan on territory as to which Afghanistan is sovereign." *Id.* at 99. Although we expressed uncertainty about whether extending habeas jurisdiction to Bagram might disrupt that arrangement, we recognized the risk in extending our jurisdiction without being able to "say with certainty what the reaction of the Afghan government would be." *Id.*

The Government represents that the United States remains at war in Afghanistan. Appellants do not dispute the Government's claim, nor can they. Whether an armed conflict has ended is a question left exclusively to the political branches. *See Ludecke v. Watkins*, 335 U.S. 160, 168 (1948); *The Three Friends*, 166 U.S. 1, 63 (1897); *The Protector*, 79 U.S. (12 Wall.) 700, 701–02 (1871); *The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862). Not only have the political branches yet to announce an end to the war in Afghanistan, but the President has repeatedly declared that it is ongoing. The President's Weekly Address, 2013 DAILY COMP. PRES. DOC. 13 (Jan. 12, 2013); The President's Address to the Nation on Military Operations in Afghanistan from Bagram Air Base, Afghanistan, 2012 DAILY COMP. PRES. DOC. 336 (May 2, 2012).

Because the war in Afghanistan continues, the war-borne practical obstacles identified in *Eisentrager* still obtain at Bagram. The United States in Afghanistan is not involved

merely in administering occupied territory and containing scattered guerilla fighters but rather in quelling a large-scale insurgency against the government of a regional ally. If preserving the "prestige of our commanders" and avoiding "conflict between judicial and military opinion" were significant goals in administering an occupied land, *Eisentrager*, 339 U.S. at 779, they are even more important in an active war zone. Allowing prisoners previously declared by the U.S. military to be enemy combatants to force military commanders into civilian court may give our allies reason to doubt the authority of, and promises made by, those commanders. Orders issued by judges thousands of miles away releasing those prisoners would undercut the commanders' authority all the more. Undermining the prestige and authority of U.S. commanders may cause "wavering neutrals" to throw their lot in with our enemies if they believe that our commanders lack the authority to, for example, provide the promised level of protection against those enemies. As in *Eisentrager*, we simply cannot discern how "allow[ing] the very enemies [a commander] is ordered to reduce to submission to call him to account in his own civil courts" would not "hamper the war effort and bring aid and comfort to the enemy." *Id*. Our conclusion is therefore unchanged: the practical obstacles posed by hearing habeas petitions from a war zone weigh "overwhelmingly" against extending the Suspension Clause to Bagram." *Al Maqaleh II*, 605 F.3d at 97.[13]

---

[13] Appellant Amanatullah suggests that our analysis should turn on the acuteness of the danger posed to a particular installation by the war, arguing that the practical obstacles posed by armed combat are less extreme at Bagram than at a forward-operating base. We do not premise constitutional distinctions on the inconstancies of shifting battle lines or the burst of mortar shells. Instead, we conclude that the practical obstacles identified in *Eisentrager* and

2

Although the state of war in Afghanistan is unchanged, the Appellants argue that new evidence demonstrates the practical obstacles identified in *Al Maqaleh II* are not as grave as we previously believed. They allege that the United States has participated in Afghan criminal proceedings at the JCIP by mentoring Afghan personnel and collecting evidence for those trials. They contend that this participation demonstrates that habeas cases would not divert " 'efforts and attention from the military offensive.' " al-Maqaleh Br. 19 (quoting *Eisentrager*, 339 U.S. at 779).

The Appellants miss *Eisentrager*'s point. The question is not whether, in the abstract, U.S. armed forces are capable of participating in judicial proceedings. We do not doubt that, with sufficient resources, U.S. forces could ably participate in habeas proceedings. The question is whether their participation would "divert [their] efforts and attention *from the military offensive abroad to the legal defensive at home*." *Eisentrager*, 339 U.S. at 779 (emphasis added). The JCIP proceedings are irrelevant to that inquiry because, unlike in habeas proceedings, U.S. assistance in Afghan criminal proceedings is a part of the "military offensive abroad." One of the chief objectives of the U.S. mission in Afghanistan is to

*Al Maqaleh II* obtain so long as the place of detention lies within an active theater of war. The judiciary as an institution is wholly incapable of making Appellant Amanatullah's proposed installation-by-installation factual inquiry. We are not the war-fighting branch of our government. Drawing these distinctions would carry us far afield from the "core areas of judicial competence" and intensify the likelihood of error where the cost of judicial error could be catastrophically high. *Lebron v. Rumsfeld*, 670 F.3d 540, 552 (4th Cir. 2012); *cf. Vance v. Rumsfeld*, 701 F.3d 193, 200 (7th Cir. 2012) (en banc).

deny our enemies a haven by building an Afghan state capable of controlling its territory. *See, e.g.*, The President's Remarks at the United States Military Academy at West Point, New York, 2009 DAILY COMP. PRES. DOC. 962, at 3–4 (Dec. 1, 2009); The President's Remarks to the American Enterprise Institute for Public Policy Research, 43 WEEKLY COMP. PRES. DOC. 165, 166–68 (Feb. 15, 2007). Part of our state-building enterprise is the fostering of a judiciary capable of administering Afghanistan's criminal laws. *See, e.g.*, DEP'T OF DEFENSE, PROGRESS TOWARD SECURITY AND STABILITY IN AFGHANISTAN 74–78 (Apr. 2012), *available at* http://www.defense.gov/pubs/pdfs/Report_Final_SecDef_04_ 27_12.pdf. Whether to devote available military resources to the support of the Afghan criminal justice system or to the pursuit of other objectives is the President's choice to make. His wartime resource-allocation decisions do not open the door to the diversion of those resources "from the military offensive abroad to the legal defensive at home." *Eisentrager*, 339 U.S. at 779.

*Eisentrager* firmly supports our conclusion. During its occupation of Germany, the United States participated in a host of military tribunals convened to try former Nazi officials for war crimes. The United States convened its own military commissions in Germany and also participated in the International Military Tribunal (IMT), an international body convened by agreement among the Allied Powers. *See generally* Charles Fairman, *Some New Problems of the Constitution Following the Flag*, 1 STAN. L. REV. 587 (1949); *see also* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis (London Agreement), August 8, 1945, 59 Stat. 1544, 8 U.N.T.S. 279. Suffice it to say that U.S. involvement in these tribunals went far beyond mere mentoring. *See generally* ROBERT CONOT, JUSTICE AT NUREMBERG (1993); *see also* Charter of the

International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 1546, 82 U.N.T.S. 279. Notwithstanding the resources expended in these tribunals, the Supreme Court concluded that *habeas* proceedings would divert "efforts and attention away from the military offensive abroad to the legal defensive at home." *Eisentrager*, 339 U.S. at 779. We think the reason for this is simple: military commissions are a part of the war effort, *see Madsen v. Kinsella*, 343 U.S. 341, 360 (1952) (military commissions necessary for "occupying power to discharge its responsibilities fully"); *In re Yamashita*, 327 U.S. 1, 11–12 (1946) (military commissions are "important incident to conduct of war"), whereas habeas proceedings are not. Because the Nuremberg trials played no role in *Eisentrager*, the JCIP trials play no role here.

The Appellants separately attack another practical obstacle we identified in *Al Maqaleh II*, to wit, the disruption of the relationship between the U.S. and Afghan governments potentially created by extension of the Suspension Clause to Bagram. *Al Maqaleh II*¸ 605 F.3d at 99. The Appellants claim to have evidence that should allay our concern: a letter, addressed to the Appellants' counsel and written at their behest, signed by the Afghan President's Chief of Staff, Abdul Karim Khurram. The letter, they argue, establishes that the Afghan government *prefers* the extension of Suspension Clause jurisdiction. In the letter, the author thanks the Appellants' counsel for their visit and writes:

> The Government of Afghanistan was never been [sic] informed of the transfer and imprisonment of [the Appellants]. We are unaware of the number of foreign nationals caught outside Afghanistan and brought to Bagram. We have no desire for them to remain on our territory. Furthermore, the Government of Afghanistan favors these individual [sic] having access to a fair judicial process and adjudication of

their case [sic] by a competent court. I hope this conformation of the Afghan Government position will allow you to pursue your efforts on behalf of [Appellant] al-Bakri.

Letter from Abdul Karim Khurram, Chief of Staff to the President of the Islamic Republic of Afg., to Ramzi Kassem and Tina Foster (Sept. 19, 2012), JA 899.

The district court concluded that the letter did not represent the Afghan government's formal policy on the detention of non-Afghan enemy combatants because it was a private letter written to a private party. *Al Maqaleh III*, 899 F. Supp. 2d at 20; *Amanatullah*, 904 F. Supp. 2d at 56. The district court's assessment seems reasonable but the letter raises deeper concerns. We recently made clear that the President alone conducts the nation's foreign policy and it is to him that we turn for authoritative statements on our relations with foreign powers. *See Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 211, 218–219 (D.C. Cir. 2013); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." (quotation marks omitted)); *cf. Munaf*, 553 U.S. at 700–02. Trying to divine the letter's meaning would carry us beyond the bounds of our authority and into the exclusive " 'province . . . of the Executive.' " *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)).

Constitutional concerns aside, we also lack the institutional wherewithal to assign to the letter its proper weight. Foreign affairs are complicated and require a political adroitness courts simply cannot supply. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) (noting that courts lack competence to deal with "nuances of the foreign

policy of the United States" (quotation marks omitted)); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983) ("This Court has little competence in determining precisely when foreign nations will be offended by particular acts . . . ."). This case proves the point. Contemporaneously with the writing of the letter, other Afghan officials apparently issued public statements on Afghanistan's detainee policy which conflict with the letter's rather cryptic statement. *See Al Maqaleh III*, 899 F. Supp. 2d at 20 & n.4 (citing Charlie Savage & Graham Bowley, *U.S. to Retain Role as a Jailer in Afghanistan*, N.Y. TIMES, Sept. 6, 2012, at A1 (describing statements of high-ranking Afghan official calling for United States to continue to detain non-Afghan detainees)). In light of this apparent conflict, how would we decide what Afghanistan's policy in fact is? The short answer is we are foreclosed from doing so. Because we lack the competence and, more importantly, the power to negotiate the subtleties of international politics, we run the very high risk of misstating Afghanistan's formal policy and "embarrass[ing] the executive arm of the government in conducting foreign relations." *Ex parte Republic of Peru*, 318 U.S. 578, 588 (1943). The facts of this case confirm the wisdom of the Framers' decision to make the President the leader, and the judiciary a follower, on foreign policy issues. *See United States v. Lee*, 106 U.S. (16 Otto) 196, 209 (1882); *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 634–35 (1818) (Marshall, C.J.).[14]

---

[14] Even if the Appellants correctly characterize the letter, our analysis of the third factor would be unchanged. We did not premise our analysis in *Al Maqaleh II* on a belief that extending the Suspension Clause to Bagram would in fact disrupt the U.S.-Afghan diplomatic relationship. We held only that our uncertainty counseled hesitation. *Al Maqaleh II*, 605 F.3d at 99. Even if we were no longer uncertain about the implications of extending the

3

The Appellants complain that the district court weighed the third factor too heavily in its analysis. *See* al-Maqaleh Br. 15 (describing district court's use of third factor as "trump card in the jurisdictional analysis" (quotation marks omitted)). But the district court gave no more weight to the factor than did we in *Al Maqaleh II*. Because the facts did not relevantly change after *Al Maqaleh II*, the district court properly applied our precedent.

Ultimately, then, the Appellants' quarrel is with how we weigh the third factor. They argue that by emphasizing the third factor over the other two, we abandon our watchtower on the wall separating the powers of our government. This argument is meritless because we are bound by *Al Maqaleh II*'s weighing of the factors and we, like the district court, have followed our precedent here. Even if we could revisit *Al Maqaleh II*, however, we think the Appellants' argument entirely misplaced in the context of petitions arising from a war zone. The Supreme Court has held that the Suspension Clause is a cornerstone of that wall, *Boumediene*, 553 U.S. at 743–46, and, in particular, a redoubt against executive power run amok, *see Lonchar v. Thomas*, 517 U.S. 314, 322 (1996). But in this case, we must place another separation-of-powers concern on the scale. The prosecution of our wars is committed uniquely to the political branches and we rarely scrutinize it. *Egan*, 484 U.S. at 529 ("[U]nless Congress has specifically provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Haig*, 453 U.S. at 292 ("Matters intimately related to foreign policy and national

protection of the writ, Afghanistan's current status as a war zone is sufficient to tilt the third factor strongly in the Government's favor.

security are rarely proper subjects for judicial intervention."); *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) ("[T]he conduct of foreign relations [and] the war power . . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." (quotation marks omitted)); *see also Regan v. Wald*, 468 U.S. 222, 242 (1984); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Justice Jackson put it best:

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Judicial inquiry into the President's detention decisions, which are among his congressionally conferred war powers, thus raises grave concerns about encroachment on the President's authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

*Boumediene* recognized this tension and concluded that, at Guantanamo, separation-of-powers considerations weigh in favor of extending the Suspension Clause beyond the sovereign borders of the United States. *Boumediene*, 553 U.S. at 796–98. But Guantanamo does not lie in a theater of war; it is far removed from the conflicts which produced its inmates. *Id.* at 770. Our forces at Bagram, by contrast, are actively

engaged in a war against a determined enemy. Like the Supreme Court, we think this is a critical distinction. *See id.* ("[I]f the detention facility were located in an active theater of war, arguments that issuing the writ would be impracticable or anomalous would have more weight." (quotation marks omitted)). Detention decisions made at Bagram are inextricably a part of the war in Afghanistan. Reviewing those decisions would intrude upon the President's war powers in a way that reviewing Guantanamo detentions does not. For that reason, the third factor weighs "overwhelmingly in favor of the position of the United States." *Al Maqaleh II*, 605 F.3d at 97. We take exception, then, to the Appellants' accusation that we are abandoning our post. To the contrary, respect for the separation of powers impels us to stay our hand.

## IV

The Appellants once again ask us to consider the President's purpose in detaining them at Bagram. Their argument, given its most generous construction, proceeds as follows: if the President has a choice to detain an alien at a location to which the writ runs,[15] but instead chooses to detain the alien at Bagram (or some other foreign locale) because the writ does not reach there, he has engaged in impermissible "manipulation" which weighs in favor of extending the Suspension Clause to the site of detention. In *Al Maqaleh II*, *although* noting that the Supreme Court's three factors may

---

[15] We note that there is little reason to question the President's choice as a matter of common sense. The four Appellants who allege a location of capture all allege capture in Asia, including Pakistan. On its face, the President's choice to detain in central Asia aliens captured in that area of the world instead of transporting them across the globe hardly arouses suspicion.

not be "exhaustive" and that evasion "might constitute an additional factor," we nevertheless rejected their argument for two reasons. *Al Maqaleh II*, 605 F.3d at 98, 99. We first concluded that the petitioners' concern was "speculation" and not "a reality." *Id.* at 98. We also found utterly incredible the suggestion that the President, who detained the petitioners at Bagram well in advance of the 2008 *Boumediene* decision, could have "predict[ed] the *Boumediene* decision long before it came down" and made his detention decisions on the basis of that prediction. *Id.* at 99.

In these appeals, however, the Appellants claim that their argument is no longer naked speculation but is supported by evidence that the President chose to detain them at Bagram in order to evade habeas review. First, relying on two conclusory declarations from former Executive Branch officials, they contend that the United States originally chose Guantanamo and Bagram as detention sites in part to avoid judicial review. Second, relying primarily on news reports, they allege that transfers from Bagram to Guantanamo declined while transfers to Bagram from Guantanamo increased after *Rasul v. Bush*, 542 U.S. 466 (2004) (holding that federal courts have statutory habeas jurisdiction over petitions filed by Guantanamo detainees), demonstrating that the Government detains persons at Bagram in order to avoid habeas review. Finally, relying on a declaration from an unrelated case, the Appellants allege that officials within the Department of Justice discussed detainee transfers and habeas jurisdiction before *Rasul* issued, indicating that the Executive Branch was "deliberating the issues of prisoner transfer and habeas jurisdiction" prior to *Boumediene*. al-Maqaleh Br. 45.

We previously expressed our "doubt that [the alleged manipulation] goes to either the second or third of the Supreme Court's enumerated factors." *Al Maqaleh II*, 605 F.3d at 98. Today we hold that it does not. The Appellants

apparently agree and, seizing on the Supreme Court's statement that "*at least* three factors are relevant in determining the reach of the Suspension Clause," *Boumediene*, 553 U.S. at 766 (emphasis added), call on us to make manipulation an "additional factor," al-Maqaleh Br. 41. Before deciding this question, we must clearly identify the species of alleged manipulation. The Appellants do not allege that they were ever within territory to which the Suspension Clause runs before being removed from that territory. Instead, they allege that the United States captured them beyond the Suspension Clause's reach and then detained them beyond it. They do not argue that the United States stripped them of a right they previously possessed but instead that it denied them the opportunity to acquire a right.

We decline the Appellants' request to create a new factor. Assuming we have authority to create additional factors, these cases are hardly the ones in which to do it.[16] The Appellants claim that their evidence moves their claims from speculation

---

[16] When considering whether to create new factors at all, caution must be our watchword. *Boumediene* marked the first time in our constitutional history that aliens held outside the sovereign territory of the United States were accorded any constitutional protection. *Boumediene*, 553 U.S. at 770. In light of that fact, we cannot read the Court's statement that "*at least* three factors are relevant in determining the reach of the Suspension Clause" as an invitation for inferior-court innovation. As a novel constitutional development, we are loath to expand *Boumediene*'s reach without specific guidance from the Supreme Court, particularly where expansion would carry us further into the realm of war and foreign policy. Restraint is also appropriate here because the evasion concern was brought to the Supreme Court's attention in *Boumediene* but the Court declined to consider it as a factor. *See* Br. *Amicus Curiae* of the Am. Bar Ass'n in Support of Pet'rs, *Boumediene v. Bush*, 553 U.S. 723 (2008), 2007 WL 2456942.

to reality.  But the line they propose between the two is an illusion.  Their allegations and supporting evidence suggest, at most, that the President *might* have considered at *some* point in time the reach of the writ as *one factor* among others in his decision to detain abroad (not necessarily at Bagram) certain *unidentified* detainees.  They do not allege, nor do they have evidence suggesting, that any official ever considered the reach of the writ in deciding where to detain *them*.  *Any* alien detained abroad could rely on the same unparticularized allegations and evidence to argue for the extension of the Suspension Clause.[17]  If that is all a detainee need do, we perceive no identifiable limitation on the extraterritorial reach of our constitutional habeas jurisdiction.  Reduced to its core, the Appellants' argument becomes an appeal for universal extraterritorial application of the Suspension Clause.  We again reject any argument tending toward this result.  "If it were the Supreme Court's intention to declare such a sweeping application, it would surely have said so." *Al Maqaleh II*, 605 F.3d at 95.[18]

---

[17] Indeed, the purported effect of potential habeas jurisdiction on the President's detention decisions was debated even before the Supreme Court's *Boumediene* decision. *See Al Maqaleh III*, 899 F. Supp. 2d at 24 (noting that assertions of evasion were "well known" before *Al Maqaleh II*); *see also* Joshua L. Dratel, *The Legal Narrative*, *in* THE TORTURE PAPERS: THE ROAD TO ABU GHRAIB xxi–xxii (2005) (pre-*Boumediene* discussion of Justice Department memoranda considering effect of executive concern about habeas jurisdiction on detention policy).

[18] Because the Appellants have provided no "specific indication" that discovery might produce any particularized evidence of evasion—and effectively concede the existence of non-evasive reasons for detaining them at Bagram—we conclude that the district court's denial of jurisdictional discovery on this

Our holding should not be read, however, to suggest that evasion of habeas review never raises constitutional hackles. An allegation that an alien detained outside our habeas jurisdiction was either captured or previously detained within our habeas jurisdiction would be far more likely to trigger our Suspension Clause jurisdiction than the allegations here. "[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.' " *St. Cyr*, 533 U.S. at 301 (quoting *Felker v. Turpin*, 518 U.S. 651, 663–64 (1996)). English common law fundamentally informs our understanding of the substantive content of the writ as of 1789. *See Boumediene*, 553 U.S. at 742, 746–52; *McNally v. Hill*, 293 U.S. 131, 136–38 (1934). Of particular importance is Parliament's codification of the common law writ in the Habeas Corpus Act of 1679, 31 Car. 2, c.2 (Eng.). *See Boumediene*, 552 U.S. at 742 (explaining influence of Act on development of writ in the colonies); *id.*at 845 (Scalia, J., dissenting) (same); THE FEDERALIST NO. 83, at 499 (Alexander Hamilton) (Clinton Rossiter ed. 1961); Dallin H. Oaks, *Habeas Corpus in the States—1776–1865,* 32 U. CHI. L. REV. 243, 252 (1965). Subject to certain exceptions, section 12 of the Habeas Corpus Act forbad the transportation of any "inhabitant or resi[de]nt" of England or Wales as a prisoner to "places beyond the seas." 31 Car. 2, c. 2, § 12 (Eng.); *see also Boumediene*, 553 U.S. at 845–46 (Scalia, J., dissenting); *Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509, 523 (D.C. Cir. 2009) (Griffith, J., concurring in judgment in part and dissenting in part); *Abdah v. Obama*, 630 F.3d 1047, 1049–51 (D.C. Cir. 2011) (Griffith, J., dissenting from denial of initial hearing en banc).

---

question was not an abuse of discretion. *Cheyenne Arapaho Tribes of Okla.*, 558 F.3d at 596.

Were a detainee to allege capture by the United States within our constitutional habeas jurisdiction followed by transfer to U.S. custody in territory beyond it, his entreaty for the protection of the Suspension Clause would be much more compelling than the Appellants'. *Cf. Kiyemba II*, 561 F.3d at 513 ("[A] potential transfer out of the jurisdiction of the court is a proper subject of statutory habeas relief . . . ."). A contrary rule risks rendering the Suspension Clause nugatory because the President could defeat it at his pleasure by transporting prisoners to U.S. detention facilities outside the United States and beyond the reach of our jurisdiction. Here, however, the Appellants were captured in places to which the Suspension Clause unquestionably does not run and therefore never secured a Suspension Clause right requiring our protection. This form of evasion does not implicate the concerns that led Parliament to ban the spiriting away of prisoners beyond the reach of the writ.

Because the Suspension Clause does not run to Bagram, section 7 of the 2006 MCA does not effect an unconstitutional suspension of the writ. We therefore affirm the judgments of the district court in *Al Maqaleh III* (Nos. 12-5404, 12-5401 and 12-5399) and *Amanatullah* (No. 12-5407). We remand *Hamidullah* (No. 12-5410) for further proceedings consistent with this opinion.

*So ordered.*