KAVANAUGH, Circuit Judge,
concurring in the judgment in part and dissenting in part:
Of the seven judges on the en banc Court for this case, five judges (all but Judge Henderson and Judge Brown) agree in light of Boumediene v. Bush that the Ex Post Facto Clause applies at Guantanamo. Indeed, the Government concedes as much. Given the Government’s concession, all seven judges on the en banc Court (including Judge Henderson and Judge Brown) therefore apply the Ex Post Facto Clause to analyze the offenses that were charged against Bahlul under the Military Commissions Act of 2006. In doing so, all seven judges reach the same bottom-line result that the Court reached in Hamdan II (here, by virtue of the Ex Post Facto Clause; there, by virtue of the 2006 Act as informed by the Ex Post Facto Clause): A military commission may not try the offense of material support for terrorism for conduct that occurred before enactment of the 2006 Act.[1] All seven judges likewise conclude that a military commission may not try the offense of solicitation for conduct that occurred before enactment of the 2006 Act. The Court is unanimous that those two offenses were not war crimes triable by military commission at the time of Bahlul’s conduct in 2001. Therefore, all seven judges agree that we must vacate Bahlul’s material support for terrorism and solicitation convictions as ex post facto violations.
As to conspiracy, six of the seven judges (all but Judge Rogers) uphold Bahlul’s conspiracy conviction against his ex post facto objection. Two of us (Judge Brown and I) would do so by employing de novo review and concluding that conspiracy, unlike material support for terrorism and solicitation, has long been an offense triable by military commission, including at the time of Bahlul’s conduct in 2001. The majority opinion likewise upholds Bahlul’s conspiracy conviction but does so by employing plain error review. The majority opinion believes that Bahlul forfeited his ex post facto objection by not raising the objection at trial.
I write separately to explain my analysis of these difficult questions, in particular my analysis of the conspiracy issue.
On September 11, 2001, Osama bin Laden learned the results of al Qaeda’s attack on the United States by listening to a radio. That radio was operated by bin Laden’s trusted aide, Ali Hamza Ahmad Suliman al Bahlul. A native of Yemen, *64 Bahlul had moved to Afghanistan in the late 1990s to join al Qaeda. Al Qaeda was and remains an international organization whose stated goals are to drive the United States from posts in the Middle East, to destroy the State of Israel, and to dislodge moderate Islamic regimes and establish radical Islamic control over the greater Middle East. To advance its broad objectives, al Qaeda employs terrorist attacks on civilian and military targets.
After his arrival in Afghanistan in the late 1990s, Bahlul became deeply embedded in al Qaeda’s operations. He pledged allegiance to bin Laden. He trained at an al Qaeda terrorist camp. He was appointed by bin Laden to lead al Qaeda’s media and propaganda operation. Bahlul produced a recruitment video glorifying al Qaeda’s October 2000 bombing of the U.S.S. Cole, an attack that killed 17 Americans. Bahlul personally arranged the loyalty oath and transcribed the “martyr will” of Mohamed Atta, Bahlul’s one-time roommate and the hijacker who flew American Airlines Flight 11 into the North Tower of the World Trade Center on September 11th. Bahlul performed the same services for Ziad Jarrah, another of Bahlul’s former roommates, who hijacked and piloted United Airlines Flight 93, the flight that apparently was headed to destroy the U.S. Capitol Building or the White House until it was downed in a Pennsylvania field by American passengers who fought back. Bahlul later said that he himself would have participated on September 11th as hijacker number 20, but bin Laden deemed his “media man” too essential to lose.
By the time of the attacks on September 11, 2001, bin Laden, Bahlul, and other senior al Qaeda leaders had already evacuated from al Qaeda’s headquarters in Kandahar and relocated to a remote mountainous region between Kabul and Khost. Soon thereafter, Bahlul fled from Afghanistan to Pakistan. In late 2001, while in Pakistan, he was captured. Since 2002, he has been detained by the U.S. Military at the U.S. Naval Base in Guantanamo pursuant to the 2001 Authorization for Use of Military Force. See Pub.L. No. 107-40, § 2(a), 115 Stat. 224, 224. The AUMF remains in effect and authorizes the Government to detain enemy combatants “for the duration of the relevant conflict”—in this instance, the ongoing global war that the United States and its allies are engaged in against al Qaeda and its associated forces. Hamdi v. Rumsfeld, 542 U.S. 507, 521, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (controlling opinion of O’Connor, J.); see Uthman v. Obama, 637 F.3d 400, 402 (D.C.Cir.2011).[2]
In addition to detaining Bahlul, the U.S. Government also exercised its well-established authority to try him before a military commission for war crimes. See 10 U.S.C. § 948d (2006); 10 U.S.C. § 821 (2000); Hamdan v. Rumsfeld, 548 U.S. 557, 592-93, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); In re Yamashita, 327 U.S. 1, 7-8, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Ex parte Quirin, 317 U.S. 1, 28, 63 S.Ct. 2, 87 L.Ed. 3 (1942). The Government ultimately charged Bahlul with three offenses specified in the Military Commissions Act of 2006: conspiracy to commit war crimes, material support for terrorism, and solicitation of war crimes. See Pub.L. No. 109-366, 120 Stat. 2600; 10 U.S.C. §§ 950u, 950v(b)(25), 950v(b)(28) (2006). Bahlul did not contest the relevant factual allegations, *65 but he vehemently objected to the legitimacy of the military commission proceeding. The military commission convicted Bahlul of all three offenses and sentenced him to life in prison. The U.S. Court of Military Commission Review affirmed. See United States v. Bahlul, 820 F.Supp.2d 1141 (C.M.C.R.2011) (en banc). Bahlul appealed to this Court, and we granted en banc review.
Bahlul challenges his military commission convictions on five distinct constitutional grounds: (i) the Article I Ex Post Facto Clause, (ii) the Article I Define and Punish Clause, (iii) the jury trial protections of Article III and the Fifth and Sixth Amendments, (iv) the equal protection component of the Due Process Clause of the Fifth Amendment, and (v) the free speech protections of the First Amendment.
With respect to his material support for terrorism and solicitation convictions, Bah-lul’s Ex Post Facto Clause argument is correct because those offenses were not war crimes triable by military commission at the time of Bahlul’s conduct in 2001. With respect to his conspiracy conviction, however, Bahlul’s Ex Post Facto Clause challenge lacks merit because conspiracy has long been proscribed under U.S. law as a war crime triable by military commission, including at the time of Bahlul’s conduct. Bahlul’s other arguments are all unavailing. Therefore, I would affirm Bahlul’s conspiracy conviction, vacate his material support for terrorism and solicitation convictions as ex post facto violations, and remand to the U.S. Court of Military Commission Review for it to address the consequences, if any, for Bahlul’s life sentence.
I
Bahlul’s primary argument to this Court rests on the Ex Post Facto Clause of Article I, Section 9 of the Constitution. See U.S. Const, art. I, § 9, el. 3 (“No Bill of Attainder or ex post facto Law shall be passed.”). Among other things, the Ex Post Facto Clause bars retroactive prosecution of new offenses. See Peugh v. United States, — U.S. -, 133 S.Ct. 2072, 2081, 186 L.Ed.2d 84 (2013); Collins v. Youngblood, 497 U.S. 37, 42-43, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Bahlul contends that (i) the Ex Post Facto Clause applies to military commissions at Guantanamo and (ii) the three offenses in the 2006 Act that were charged against him— conspiracy to commit war crimes, material support for terrorism, and solicitation of war crimes—were new offenses that were not triable by military commission at the time of his conduct back in 2001.
In response, the Government concedes (correctly) that the Ex Post Facto Clause applies to military commissions at Guantanamo. Cf. Boumediene v. Bush, 553 U.S. 723, 766-71, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008).[3] And the Government all but con *66 cedes (again correctly) that material support for terrorism and solicitation were new offenses that were not triable by military commission back in 2001. See Ham-dan v. United States, 696 F.3d 1238, 1252 (D.C.Cir.2012) (Hamdan II). But the Government forcefully argues that one of the three offenses charged against Bahlul, conspiracy, was not a new offense. According to the Government, conspiracy has long been triable by military commission under U.S. law, including at the time of Bahlul’s conduct.
The relevant military commission law in effect at the time of Bahlul’s conduct was 10 U.S.C. § 821. That statute was first enacted in 1916 and then re-enacted in 1950 as part of the Uniform Code of Military Justice. See Pub.L. No. 81-506, 64 Stat. 107, 115 (1950); Pub.L. No. 64-242, 39 Stat. 619, 653 (1916). As of 2001, at the time of Bahlul’s conduct, Section 821 provided as follows:
The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals.
10 U.S.C. § 821 (2000) (emphasis added).
As the Deputy Solicitor General aptly stated at oral argument, the question at the heart of this case is whether, as of 2001, conspiracy to commit war crimes was an offense proscribed under the “law of war” prong of Section 821. See Tr. of Oral Arg. at 15-20. The Supreme Court faced that exact same question in Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court as a whole did not decide the issue because it was not necessary to do so given the Court’s conclusion that the military commissions then in place were unlawful on certain procedural grounds. As a result, there is no binding precedent from that case on the conspiracy issue. But seven Justices opined on the conspiracy question and split 4-3 in contrasting opinions written by Justice Stevens and Justice Thomas. (Justice Kennedy did not address the conspiracy charge. Chief Justice Roberts did not take part in the case.) Justice Stevens’s opinion concluded that conspira *67 cy was not a law of war offense under Section 821. See 548 U.S. at 600-12, 126 S.Ct. 2749. Justice Thomas’s opinion concluded that conspiracy was a law of war offense under Section 821. See id. at 697-706,126 S.Ct. 2749.
Importantly for our purposes as a lower court, all seven Justices who addressed the Section 821 “law of war” issue in Hamdan agreed that it turned on the content of the “common law of war” and required careful evaluation of historical U.S. military commission precedents involving conspiracy. Id. at 602, 126 S.Ct. 2749 (Stevens, J.); id. at 689, 126 S.Ct. 2749 (Thomas, J.). Although the two opinions reached different answers, they considered the same basic question: Did the U.S. military commission precedents suffice to show that conspiracy was a law of war offense triable by military commission under Section 821?
The detailed historical inquiry undertaken by the seven Justices in Hamdan was not idle background discussion. On the contrary, the historical inquiry followed from the text of Section 821. Enacted in 1916 when Congress amended the Articles of War and set forth new rules for courts-martial, and then re-enacted in 1950 as part of the Uniform Code of Military Justice, Section 821 provided that the new rules governing courts-martial did not “deprive” military commissions of their preexisting authority. 10 U.S.C. § 821 (2000).[4] Notwithstanding Section 821’s somewhat unusual negative phrasing, the Supreme Court has repeatedly interpreted Section 821 as affirmative statutory authorization for the Executive Branch to convene military commissions to try war crimes. See Hamdan, 548 U.S. at 592, 126 S.Ct. 2749; In re Yamashita, 327 U.S. 1, 7-8, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Ex parte Quirin, 317 U.S. 1, 28, 63 S.Ct. 2, 87 L.Ed. 3 (1942). With its reference to statutory offenses, Section 821 authorizes military commissions to try offenses such as spying and aiding the enemy that are triable by military commission under federal statute. See 10 U.S.C. §§ 904, 906 (2000); Quirin, 317 U.S. at 41-42, 63 S.Ct. 2. With its reference to the “law of war,” a term that encompasses the international law of war, Section 821 authorizes military commissions to try offenses that are war crimes under international law. See Yamashita, 327 U.S. at 7, 14-16, 66 S.Ct. 340. Moreover, as the seven Justices in Hamdan recognized with their extensive focus on U.S. military commission precedents— and as the Supreme Court stated in Madsen v. Kinsella in 1952 and Yamashita in 1946—Section 821’s “law of war” prong also expressly preserved the authority of military commissions to try offenses that had traditionally been tried by U.S. military commissions as of 1916 and 1950. See Madsen v. Kinsella, 343 U.S. 341, 352, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (statute “states unequivocally that Congress has not deprived such commissions or tribunals of the existing jurisdiction which they had over such offenders and offenses as of August 29, 1916”); Yamashita, 327 U.S. at 20, 66 S.Ct. 340 (statute authorized military commissions “to preserve their traditional jurisdiction over enemy combatants”); cf. Sekhar v. United States, — U.S. -, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013) (when “a word is obvi *68 ously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it”) (internal quotation mark omitted).
Bahlul nevertheless argues that the phrase “law of war” in Section 821 encompasses only international law offenses and not those offenses traditionally triable by U.S. military commissions. In other words, Bahlul says that Section 821, although expressly crafted not to “deprive” U.S. military commissions of their existing common-law authority over conspiracy and other offenses, did in fact deprive military commissions of that authority for offenses that were not also proscribed by the international law of war.
Bahlul’s argument that Section 821’s “law of war” prong consists exclusively of international law offenses is inconsistent with the text and textually stated purpose of Section 821, as well as with Supreme Court precedents such as Madsen and Ya-mashita interpreting Section 821. Perhaps most tellingly for present purposes, Bahlul’s interpretation of Section 821 conflicts with what the Supreme Court actually did in Hamdan. Seven Justices in Hamdan analyzed the “law of war” embodied in Section 821 as the international law of war supplemented by established U.S. military commission precedents. Indeed, that is the only interpretation of Section 821 that squares with how the seven Justices analyzed the question in Hamdan.
In short, at the time of Bahlul’s conduct, Section 821 authorized military commissions to try offenses drawn from three bodies of law: federal statutes defining offenses triable by military commission, the international law of war, and historical U.S. military commission tradition and practice as preserved by Congress when it enacted Section 821 in 1916 and 1950.[5]
At the time of Bahlul’s conduct, neither any federal statute nor the international law of war proscribed conspiracy as a war crime triable by military commission. So the question we must decide is whether U.S. military commission precedents treated conspiracy as an offense triable by military commission. In other words, we must decide the question that was addressed by seven Justices in Hamdan but not decided by the Court. The answer, in my view, is yes: U.S. military commission precedents have treated conspiracy as an offense triable by military commission.
I base that conclusion in substantial part on the 1865 military commission conviction of the conspirators who plotted to assassinate President Lincoln. Put simply, the military commission trial of the Lincoln conspirators is the highest-proflle and most important U.S. military commission precedent in American history. President Andrew Johnson, after seeking the advice of the Attorney General, decided to *69 try the Lincoln conspirators by military commission for violating the law of war rather than by criminal trial in civilian court. See Military Commissions, 11 Op. Attorney Gen. 297 (1865); see also Ex parte Mudd, 17 F.Cas. 954 (S.D.Fla.1868). The Lincoln conspirators were expressly charged with and convicted of conspiracy—in that case, conspiracy to violate the law of war by killing the President and Commander in Chief of the Union Army, Abraham Lincoln. Indeed, conspiracy was the only offense charged against them. After an extensive multi-week trial and vigorous argument about the facts and the commission’s jurisdiction, numerous conspirators were convicted, and several of them were sentenced to death and executed.
In considering the history of U.S. military commissions, particularly at the time of Section 821’s original enactment in 1916 and its re-enactment in 1950, the Lincoln conspirators case looms as an especially clear and significant precedent.
The Lincoln conspirators precedent does not stand alone. The second highest-profile and second most important U.S. military commission in American history was the military commission trial of the Nazi saboteurs who secretly crossed into the United States during World War II. Again, the defendants were expressly charged with and convicted of conspiracy, as well as of another law of war offense. The Attorney General of the United States personally prosecuted the case before the military commission. President Franklin Roosevelt, the Commander in Chief of the Army and Navy, reviewed and affirmed all of the convictions. Upon its review, the Supreme Court affirmed the saboteurs’ convictions based on the other law of war offense, making it unnecessary to address conspiracy. See Quirin, 317 U.S. at 46, 63 S.Ct. 2. Like the Lincoln conspiracy precedent, the trial of the Nazi saboteurs still stands as a major precedent in which a U.S. military commission charged and convicted the defendants of conspiracy.
To summarize so far: As of 1950 when Congress reenacted Section 821 as part of the Uniform Code of Military Justice and expressly preserved the traditional authority of U.S. military commissions, the two most well-known and important U.S. military commissions in American history tried and convicted the defendants of conspiracy.
And there were other significant precedents as well. For example, later in World War II, the Government prosecuted another set of Nazi saboteurs by military commission for conspiracy. In that case, Assistant Attorney General Tom Clark produced a formal memorandum concluding—based in large part on the precedents involving the Lincoln conspirators and the earlier Nazi saboteurs—that conspiracy was a law of war offense triable by military commission. Sec Memorandum from Tom C. Clark, Assistant Attorney General, to Myron C. Kramer, Judge Advocate General (Mar. 12, 1945), reprinted in U.S. SuppApp. 133-139. The military commission subsequently convicted the defendants of conspiracy. President Truman reviewed and affirmed the convictions. And after one of those Nazi saboteurs later challenged his conviction in court, the Tenth Circuit upheld the conviction, including the conspiracy conviction, in an opinion by Judge Murrah. See Colepaugh v. Looney, 235 F.2d 429 (10th Cir.1956).
To be sure, against those landmark American precedents, some international tribunals and conventions subsequent to the original enactment of Section 821 have chosen not to make conspiracy a war crime triable by military commission. Most notably, the International Military Tribunal at Nuremberg did not identify conspiracy *70 to commit war crimes as an offense triable before that Tribunal. But the Tribunal reached that conclusion over the objections of the American prosecution team led by Justice Robert Jackson, and the Tribunal did so in part because conspiracy was not recognized by European law. See Ham-dan, 548 U.S. at 611, 126 S.Ct. 2749 (Stevens, J.); id. at 702 n. 14, 126 S.Ct. 2749 (Thomas, J.).
In any event, what matters for present purposes is that at the time of Bahlul’s conduct, no authoritative source of U.S. law had ever negated the validity or authority of the U.S. military commission convictions of the Lincoln assassins for conspiracy or of the Nazi saboteurs for conspiracy. In 1916, when it enacted Section 821, as well as in 1950 when it reenacted the statute, Congress was aware of those significant precedents. See id. at 592 & n. 22, 126 S.Ct. 2749 (majority opinion) (recounting legislative history of 1950 enactment and noting Congress’s awareness of Quirin precedent); Madsen, 343 U.S. at 353 & n. 20, 72 S.Ct. 699 (recounting legislative history of 1916 enactment, including discussion of Civil War, Mexican-Ameriean War, and Spanish-American War precedents); A Bill to Unify, Consolidate, Revise, and Codify the Articles of War, Hearing on H.R. 2498: Before Subcommittee No. 1 of the House Committee on Armed Services, 81st Cong. 962 (1949) (“A classical example of the military tribunal is the trial of the Lincoln conspirators.”) (testimony of Colonel John P. Dinsmore); see also Trials by Courts-Martial: Hearing on S. 5320 Before the Senate Committee on Military Affairs, 65th Cong. 279 (1919) (Judge Advocate General Enoch H. Crowder discussing Lincoln conspirators trial). Moreover, the leading authority on military commissions at the time of both enactments, Colonel William Winthrop’s treatise on military law, repeatedly referenced the Lincoln conspirators precedent. See William Win-theop, Military Law and Precedents 167, 169, 185 n. 38, 334 n. 40, 834 & n. 77, 836 n. 90, 839 n. 5 (rev.2d ed.1920).
By stating that Section 821 did not “deprive” military commissions of their traditional authority, Congress necessarily incorporated the Lincoln assassins precedent for conspiracy when it enacted the original version of Section 821 in 1916, and it incorporated the Lincoln assassins and Nazi saboteur precedents for conspiracy when it re-enacted the statute in 1950 as part of the Uniform Code of Military Justice. After all, it would be rather bizarre to conclude that Congress, by enacting a statute that said it did not “deprive” military commissions of their traditional authority, in fact silently overruled the two most significant and well-known military commission precedents in American history. Since 1950, moreover, Congress has never backed away from its express preservation of traditional U.S. military commission authority over conspiracy. Indeed, in the 2006 Act, Congress reiterated its longstanding intent and belief that conspiracy has “traditionally been triable by military commissions.” 10 U.S.C. § 950p(a) (2006).
At the time of Bahlul’s conduct, the other two Branches likewise had never undermined the validity of the Lincoln conspirators and Nazi saboteur precedents. No U.S. court had ever cast any doubt on those landmark military commission convictions, or on trying conspiracy by military commission. And in the Executive Branch, there is a straight line from now to then: In deciding that conspiracy is an offense that may be tried by military commission, President Barack Obama is the same as President George W. Bush is the same as President Harry Truman is the same as President Franklin Roosevelt is the same as President Andrew Johnson is the same as President Abraham Lincoln.
*71 In light of the clear and consistent historical record in the United States as of the time of Bahlul’s conduct in 2001—in all three Branches of the U.S. Government— it is ultimately not persuasive to say, as Bahlul does, that conspiracy was a brand new U.S. military commission offense created by the 2006 Act. If we indulge the idea that Bahlul, holed up with bin Laden somewhere in the hills of Afghanistan, consulted U.S. military commission law on conspiracy back in 2001, he would have readily found the two most well-known U.S. military commission precedents, the landmark Lincoln assassin and Nazi saboteur cases in which the defendants had been convicted of conspiracy.
In sum, conspiracy was triable by military commission under the law of war prong of Section 821 at the time of Bah-lul’s conduct in 2001. The Ex Post Facto Clause therefore does not bar the Government’s prosecution of Bahlul under the 2006 Act for conspiracy. And for that same reason, to the extent that Bahlul argues that the 2006 Act itself incorporates ex post facto principles and bars retroactive prosecution of new offenses, the 2006 Act likewise does not bar the Government’s prosecution of Bahlul for conspiracy.[6]
By contrast, as the Government all but concedes, there is no historical U.S. military commission precedent for trying the offenses of material support for terrorism and solicitation before U.S. military commissions. And those two offenses are not international law of war offenses, nor were they triable by military commission under any other federal statute at the time of Bahlul’s conduct. The Government’s actions between the attacks of September 11, 2001, and the enactment of the 2006 Act underscore that material support for terrorism and solicitation have not been thought to be Section 821 “law of war” offenses. During that time, the United States charged 10 al Qaeda defendants before military commissions. The United States did not charge any of them with material support for terrorism or solicitation, presumably because it was widely understood that those two offenses were not covered under Section 821. By contrast, the United States charged all 10 al Qaeda defendants with conspiracy, presumably because the Government believed, based on the historical precedents, that conspiracy was covered under Section 821.
In short, unlike conspiracy, material support for terrorism and solicitation were *72 not covered under Section 821 at the time of Bahlul’s conduct in 2001. See Hamdan II, 696 F.3d at 1252 (concluding that material support for terrorism was not covered under Section 821). Bahlul’s convictions for material support for terrorism and solicitation therefore must be vacated as ex post facto violations.
II
In challenging his convictions, Bahlul also advances a far more sweeping constitutional argument. He contends that Congress lacks constitutional authority to make conspiracy, material support for terrorism, or solicitation war crimes triable by military commissions, even prospectively, because those offenses are not proscribed under the international law of war. Bahlul’s argument, in essence, is that the U.S. Constitution (as relevant here) incorporates international law and thereby interposes international law as a constitutional constraint on what crimes Congress may make triable by military commission. On its face, that is an extraordinary argument that would, as a matter of U.S. constitutional law, subordinate the U.S. Congress and the U.S. President to the dictates of the international community—a community that at any given time could be unsupportive of or even hostile to U.S. national security interests as defined by Congress and the President. And because conspiracy is not and has not been an offense under the international law of war, the argument would render the Lincoln conspirators and Nazi saboteur convictions for conspiracy illegitimate and unconstitutional. I would reject the argument.
Bahlul spins out the argument in two different ways. First, he contends that Congress’s authority to create offenses triable by military commission stems exclusively from the Article I Define and Punish Clause, which allegedly confines military commissions to trying only international law of war offenses. I will consider that argument in this Part II of the opinion. Second, Bahlul contends that the jury trial protections of Article III and the Fifth and Sixth Amendments generally require jury trials, and that the exception to those jury trial protections for military commissions applies only to international law of war offenses. I will consider that argument in Part III below.[7]
Bahlul says that Congress may enact offenses triable by U.S. military commissions only under Congress’s Article I, Section 8 power to “define and punish ... Offences against the Law of Nations.” U.S. Const, art. I, § 8, cl. 10. Because conspiracy is not an offense under international law, Bahlul argues that Congress lacked power under Article I, Section 8 to make the offense triable by military commission.
The premise of this argument is incorrect. As the Supreme Court has repeatedly stated, Congress’s authority to establish military commissions to try war crimes does not arise exclusively from the Define and Punish Clause. On the contrary, as the Supreme Court has explained, Congress also has authority to establish military commissions to try war crimes under the Declare War and Necessary and Proper Clauses of Article I, Section 8. See U.S. *73 Const, art. I, § 8, els. 11, 18; Hamdan v. Rumsfeld, 548 U.S. 557, 591-92 & n. 21, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); Madsen v. Kinsella, 343 U.S. 341, 346 n. 9, 72 S.Ct. 699, 96 L.Ed. 988 (1952); Ex parte Quirin, 317 U.S. 1, 26-31, 63 S.Ct. 2, 87 L.Ed. 3 (1942); see also William Winthrop, Military Law and Precedents 831 (rev.2d ed.1920) (military commission “is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war”). And unlike the Define and Punish Clause, the Declare War Clause and the other Article I war powers clauses do not refer to international law and are not defined or constrained by international law. In other words, at least as a matter of U.S. constitutional law (as distinct from international law), the United States is not subject to the whims or dictates of the international community when the United States exercises its war powers. Therefore, under the text of Article I, international law is not a constitutional constraint when Congress proscribes war crimes triable by military commission.
That interpretation also follows from historical practice. In accordance with the constitutional text, Congress since the earliest days of the Republic has gone beyond international law in proscribing war crimes triable by military commission. See 10 U.S.C. §§ 950t(26), 950t(27) (2012) (aiding the enemy and spying); 10 U.S.C. §§ 904, 906 (2000) (same); Articles of War of 1806, 2 Stat. 359, 366, 371 (1806) (same). That historical practice strongly supports the conclusion that international law is not a constitutional constraint when Congress proscribes war crimes triable by military commission. Cf. NLRB v. Noel Canning, No. 12-1281 (U.S. June 26, 2014) (relying on longstanding historical practice to interpret Constitution).
And perhaps most important for us as a lower court is the Supreme Court’s decision in Quirin. There, the Court rejected various constitutional challenges to military commissions. In so doing, the Court emphasized among other things that U.S. military commissions have long possessed statutory authority to try the offense of spying, which was not and has never been an offense under the international law of war. See Quirin, 317 U.S. at 41-42, 63 S.Ct. 2; see also U.S. Br. 71 (spying not an international law of war offense); National Institute of Military Justice Amicus Br. 18 n. 8 (same); Hamdan v. United States, 696 F.3d 1238, 1246 n. 6 (D.C.Cir.2012) (Ham-dan I) (Kavanaugh, J., concurring) (same). Quirin's approval of spying, a non-international-law-of-war offense, as an offense triable by military commission confirms that Congress has authority under the Constitution to make non-international-law-of-war crimes triable by military commission.
In short, the constitutional text, longstanding statutes, and Supreme Court precedent all demonstrate that Article I does not limit Congress to international iaw of war offenses when it proscribes war crimes triable by military commission.
Ill
Citing the jury trial protections of Article III and the Fifth and Sixth Amendments, Bahlul reprises the same basic argument that U.S. military commissions may try only international law of war offenses. This version of Bahlul’s argument begins with the premise that the Constitution requires all crimes to be tried by jury. Bahlul recognizes, as he must, that the Supreme Court in Quirin nonetheless permitted trial by military commission for war crimes. See Ex parte Quirin, 317 U.S. 1, 38-45, 63 S.Ct. 2, 87 L.Ed. 3 (1942); see also Hamdan v. Rumsfeld, 548 U.S. 557, *74 592-93, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). But Bahlul says that this exception to the jury trial right extends only to international law of war offenses.
To begin with, there is no textual support for Bahlul’s theory. There is no textual reason to think that the exception to the jury trial protections for military commissions is somehow confined to international law of war offenses. That exception, as the Supreme Court has explained, stems from the various war powers clauses in Article I and Article II. And those war powers clauses are not defined or constrained by international law. See Ham-dan, 548 U.S. at 591-92, 126 S.Ct. 2749; Quinn, 317 U.S. at 25-27, 63 S.Ct. 1.
Moreover, Bahlul’s novel theory contravenes precedent: It is inconsistent with the Lincoln conspirators and Nazi saboteurs conspiracy convictions, and it cannot be squared with Quirin.
In Quirin, the defendants argued that they had a constitutional right to trial by jury and thus could not be tried by military commission. At some length, the Court in Quirin specifically rejected the defendants’ Article III and Fifth and Sixth Amendment jury trial objections to trial by military commission. See Quirin, 317 U.S. at 38-45, 63 S.Ct. 1. The Court explained that the Constitution’s jury trial provisions “did not enlarge the right to jury trial” beyond the right as it existed at common law. Id. at 39, 63 S.Ct. 1. Because the common law did not preclude military commission trials, “Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission.” Id. at 40, 63 S.Ct. 1.
For present purposes, two things are notable about Quirin. First, in reaching its conclusion on the jury trial issue, the Court relied on the fact that Congress had made spying an offense triable by military commission since the earliest days of the Republic. The Court said that the early Congress’s enactment of the spying statute “must be regarded as a contemporary construction” of both Article III and the Fifth and Sixth Amendments “as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces.” Id. at 41, 63 S.Ct. 2. “Such a construction,” the Court said, “is entitled to the greatest respect.” Id. at 41-42, 63 S.Ct. 2. To reiterate, the offense of spying on which the Court relied was not and has never been an offense under the international law of war. It thus makes little sense to read Quirin as barring military commission trial of non-international-law-of-war offenses when Quirin, in rejecting a jury trial objection to military commissions, relied expressly on a longstanding statute making a non-international-law-of-war offense triable by military commission. Second, nothing about the Court’s reasoning in Quirin on this point depended on whether the offense tried before a military commission was an international law of war offense or, by contrast, was a military commission offense recognized only by U.S. law. In other words, the Court never stated that military commissions are constitutionally permitted only for international law of war offenses, which one would have expected the Court to say if the Court believed that military commissions are constitutionally permitted only for international law of war offenses.
In short, neither Article I nor the jury trial protections of Article III and the Fifth and Sixth Amendments limit Congress to the international law of war when Congress proscribes war crimes triable by military commission. Put another way, the United States may be a leader in the international community, not just a follow *75 er, when Congress authorizes war against a terrorist organization or makes crimes such as conspiracy war crimes triable by military commission. To be sure, it can be quite prudent (and in some circumstances required as a matter of international law) for Congress and the President to coordinate closely with the international community and to pay careful attention to international law when authorizing war and enacting war crimes triable by military commission. But those policy factors, political realities, and international law considerations are not constitutional constraints incorporated into the Article I war powers clauses or the jury trial guarantees of Article III and the Fifth and Sixth Amendments.
IV
Bahlul also raises an equal protection challenge under the Due Process Clause of the Fifth Amendment. Bahlul argues that the Military Commissions Act of 2006 violated equal protection principles because it was underinclusive in authorizing military commission trials of alien enemy combatants but not of U.S. citizen enemy combatants. See 10 U.S.C. §§ 948b(a), 948c, 948d(a) (2006); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (Fifth Amendment includes equal protection component). That argument is merit-less.
The Government correctly points out that many federal laws draw distinctions between U.S. citizens and aliens, and that the Supreme Court has upheld many such laws. See, e.g., Demore v. Kim, 538 U.S. 510, 522, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); Mathews v. Diaz, 426 U.S. 67, 78-80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); see also Bluman v. FEC, 800 F.Supp.2d 281, 287 (D.D.C.2011), affirmed, — U.S. -, 132 S.Ct. 1087, 181 L.Ed.2d 726 (2012). The Supreme Court has explained that any federal “policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government” and that such “matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.” Mathews, 426 U.S. at 81 n. 17, 96 S.Ct. 1883 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952)). As a result, federal laws drawing distinctions between U.S. citizens and aliens—particularly in the context of war and national security—are generally permissible so long as they are rationally related to a legitimate governmental interest. See Demore, 538 U.S. at 527-28, 123 S.Ct. 1708; Mathews, 426 U.S. at 83, 96 S.Ct. 1883; United States v. Ferreira, 275 F.3d 1020, 1025-26 (11th Cir.2001); United States v. Due, 134 F.3d 79, 87 (2d Cir.1998); Narenji v. Civiletti, 617 F.2d 745, 747 (D.C.Cir. 1979). Here, Congress chose to create a distinct system of military commissions to try non-U.S. citizens who commit war crimes. The Government reasonably explains that “Congress had a vital national security interest in establishing a military forum in which to bring to justice foreign unlawful belligerents whose purpose it is to terrorize innocent U.S. citizens and to murder U.S. military personnel.” U.S. Panel Br. 86. Such a wartime distinction between alien enemy combatants and U.S. citizens easily satisfies rational basis review. Cf. Johnson v. Eisentrager, 339 U.S. 763, 768-77, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Bahlul’s equal protection challenge has no merit.
V
Bahlul also raises a First Amendment argument, claiming that he was unconstitu *76 tionally prosecuted for his political speech, including his production of the al Qaeda recruitment video celebrating the terrorist attack on the U.S.S. Cole. That argument, too, lacks any merit.
As an initial matter, Bahlul was convicted of conspiracy based on his conduct. The military commission found that Bah-lul, among other acts, “traveled to Afghanistan with the purpose and intent of joining al Qaeda,” “underwent military-type training at an al Qaeda sponsored training camp,” “acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda,” arranged for two September 11th hijackers to pledge loyalty oaths to bin Laden, and “operated and maintained data processing equipment” “for the benefit of Usama bin Laden.” App. 122-23.
Moreover, although non-U.S. citizens arguably may have some First Amendment rights at Guantanamo or in other U.S. territories for any speech they engage in there, non-U.S. citizens have no First Amendment rights abroad in foreign countries. The Supreme Court has applied the Constitution to aliens in the United States and in U.S. territories, but has not extended constitutional rights to aliens in foreign countries. See Boumediene v. Bush, 553 U.S. 723, 768-71, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (applying Article I, Section 9 to U.S. Naval base at Guantanamo, which was “[i]n every practical sense ... not abroad”); United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (declining to apply Fourth Amendment to search and seizure of alien’s property in Mexico); Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (declining to apply habeas corpus right to U.S.-controlled military prison in Germany); see also Al Maqaleh v. Hagel, 738 F.3d 312 (D.C.Cir.2013) (declining to apply habeas corpus right to U.S. military base in Afghanistan); Al Maqaleh v. Gates, 605 F.3d 84 (D.C.Cir. 2010) (same). Therefore, Bahlul had no First Amendment rights as a non-U.S. citizen in Afghanistan when he led bin Laden’s media operation.
In addition, even if the First Amendment did apply to Bahlul’s speech in Afghanistan, the Supreme Court has made clear that the First Amendment does not protect speech such as Bahlul’s that is “directed to inciting or producing imminent lawless action and is likely to incite or produce such action.” Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (quoting Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)); see also United States v. Stevens, 559 U.S. 460, 471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (First Amendment not understood to protect “speech or writing used as an integral part of conduct in violation of a valid criminal statute”). That is particularly true when the Government seeks “to prevent imminent harms in the context of international affairs and national security.” Holder v. Humanitarian Law Project, 561 U.S. 1, 35, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010); see United States v. Rahman, 189 F.3d 88, 116-18 (2d Cir.1999). Under that traditional test, the speech encompassed within the charges against Bahlul—including a terrorist recruitment video produced on foreign soil that “was aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction”—was not protected speech under the First Amendment. United States v. Bahlul, 820 F.Supp.2d 1141, 1249 (C.M.C.R.2011) (en banc). The Constitution is not a suicide pact. Cf. Terminiello v. City of Chicago, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting).
VI
A few words in response to the majority opinion: I find the majority opinion sur *77 prising both in what it decides and in what it declines to decide.
First, I am surprised by what the majority opinion decides. After all, the majority opinion reaches the same bottom-line conclusion that this Court reached in Hamdan II: The offense of material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act. But the majority opinion does so based on the Ex Post Facto Clause alone and “overrules” Hamdan II’s statement that the 2006 Act itself incorporates ex post facto principles. That seems to be a meaningless exercise by the majority opinion. Applying the canon of constitutional avoidance, Hamdan II reasoned that the 2006 Act could not be applied to new offenses that were not previously triable by military commission. Hamdan II was based on its understanding of the limits of the Ex Post Facto Clause. Ham-dan II indicated that the 2006 Act allowed prosecutions of the listed offenses for pre-2006 conduct to the extent that the Ex Post Facto Clause allowed such prosecutions. As the Court said, “Congress incorporated ex post facto principles into the terms of’ the Act. Hamdan II, 696 F.3d at 1248 (internal quotation mark omitted). So whether we apply the Constitution to inform interpretation of the statute or we apply the Constitution to limit the statute, the question in this case is the same: What are the constraints imposed by the Ex Post Facto Clause?[8]
On that question, my view is that the Ex Post Facto Clause bars retroactive prosecution at Guantanamo of new offenses that were not previously triable by military commission. But the majority opinion suggests (although it does not definitively conclude) that the Ex Post Facto Clause is less of a constraint on the Government and may allow military commissions at Guantanamo to retroactively prosecute offenses that were previously triable as federal crimes in Article III federal courts, even if those offenses were not previously triable by military commission.
I am surprised by this rather aggressive suggestion about the meaning of the Ex Post Facto Clause. After all, that position was not forcefully advocated by the Government in its submission to the en banc Court, as the argument appeared only in a short discussion late in its brief. In the hour-long oral argument, moreover, the Government did not advance that argument, and no Judge asked any question along those lines or suggested this as a possible approach.
Moreover, like Judge Brown (as well as Judge Rogers), I too respectfully have serious doubts about the majority opinion’s suggestion that the Ex Post Facto Clause may allow military commissions to retroactively prosecute crimes that were previously triable as federal crimes in federal court even when they were not previously triable by military commission. Can Congress, consistent with the Ex Post Facto Clause, really just pull out the federal *78 criminal code and make offenses retroactively triable before military commissions? I am aware of no commentator who has taken that position or even analyzed the question. I have found no precedent taking that position or analyzing the question. And even Congress, hardly in a passive mode when it enacted the 2006 Act, did not go so far as the majority opinion about the meaning of the Ex Post Facto Clause. The text of the 2006 Act reveals that Congress thought there was no ex post facto problem because the listed offenses were previously triable by military commission. See 10 U.S.C. § 950p(a) (2006). If Congress had thought it enough that there were some prior federal criminal statutes on the books, Congress no doubt would have relied on that point to respond to the ex post facto concerns. But as best as I can tell, no Member said as much. On the contrary, the text of the Act itself demonstrates that Congress thought it necessary, in order to overcome ex post facto objections, to show that the offenses had been previously triable by military commission.
It is especially surprising for the majority opinion to take its doubly aggressive approach—overruling one aspect of a precedent of this Court and advancing a heretofore unheard-of view of the Ex Post Facto Clause’s application to military commissions—when it is unnecessary to do so here. After all, in what it terms an “independent and alternative” holding, the majority opinion says that plain error review applies and concludes that the conspiracy conviction was not plain error because conspiracy at least arguably was triable by military commission under Section 821 at the time of Bahlul’s conduct. The majority opinion notes, correctly, that it is impossible to describe the Government’s position on conspiracy and Section 821 as plain error when the issue remains open in the Supreme Court and three Justices in Harridan agreed with the Government’s position. The majority opinion could have said no more than what it says about Section 821 to resolve the conspiracy ex post facto issue for purposes of Bahlul’s appeal.
Second, from the other direction, I am also surprised by what the majority opinion does not decide. We took this case en banc specifically to decide whether, consistent with the Ex Post Facto Clause, a military commission could try conspiracy for conduct that occurred before the 2006 Act. Yet the majority opinion does not actually decide that question.
That is because the majority opinion applies the plain error standard of review. The majority opinion thus does not decide whether there was error in the conspiracy conviction; instead, it decides only whether any alleged error was plain.
Like Judge Brown (as well as Judge Rogers), I too disagree with the majority opinion’s use of a plain error standard of review. To begin with, Bahlul did not forfeit his ex post facto objection, so he is legally entitled to de novo review of that issue and does not have to meet the high bar of showing plain error. Bahlul raised an ex post facto issue when he pled not guilty and, among other things, posed to the Military Judge a “legal question”: “Does the law here start from before, during, or after?” SuppApp. 37; see id. (Bahlul asking whether “the law here” “stems from the action, before action, or post action?”).
But put that aside. Even if Bahlul did not expressly raise an ex post facto objection at trial, the issue is not forfeitable under Rules 905 and 907 of the Rules of Military Commissions. Those Rules contain two exceptions to the usual forfeiture rules for objections based on a “lack of jurisdiction” or “failure of a charge to allege an offense.” Manual for Military Commissions pt. II, at 11-83-84 (2007); *79 see id. at 11-87; see also Manual for Military Commissions pt. II, at 11-89-91, 11-95 (2012). In this case, each of those two exceptions applies. As the relevant statutes say on their face, the question of whether conspiracy may be charged is jurisdictional—whether the military commission had “jurisdiction” over the offense. 10 U.S.C. § 948d(a) (2006) (military commissions have “jurisdiction to try any offense made punishable by this chapter or the law of war”) (emphasis added); 10 U.S.C. § 821 (2000) (“provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions ... of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions”) (emphases added). Indeed, the Military Judge construed Bahlul’s sometimes rambling comments as an objection to the military commission’s jurisdiction. See Supp.App. at 31-32.
And in any event, the question raised by Bahlul in this Court is surely whether the conspiracy charge fails to “allege an offense,” which is the other kind of non-forfeitable objection under Rules 905 and 907.[9] Although there is obviously scarce precedent interpreting the recently promulgated Rules of Military Commissions with respect to a charge that fails to state an offense, the same basic language is found in Federal Rule of Criminal Procedure 12(b)(3)(B). That Criminal Rule provides an exception to waiver or forfeiture in criminal cases for, among other things, a claim that the indictment or information “fails to state an offense.” Interpreting that language, courts have determined that constitutional objections such as Ex Post Facto Clause claims challenging the validity of the charge are objections that the charge failed to state an offense—and thus may be raised for the first time on appeal and reviewed de novo even if those objections were not timely raised in the district court proceedings. See United States v. Haddock, 956 F.2d 1534, 1542 (10th Cir. 1992) (reviewing de novo Ex Post Facto Clause challenge that was not raised prior to trial); United States v. Gilbert, 813 F.2d 1523, 1528-29 (9th Cir.1987) (constitutional challenges attacking “the sufficiency of the information to charge an offense ... may be raised for the first time on appeal”); United States v. Seuss, 474 F.2d 385, 387 n. 2 (1st Cir.1973) (“The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional. That objection may be raised for the first time on appeal.”); see also United States v. Al Hedaithy, 392 F.3d 580, 586 (3d Cir.2004) (reviewing de novo Rule 12(b)(3)(B) objection that was not raised at trial); United States v. Panarella, 277 F.3d 678, 682-86 (3d Cir.2002) (same); United States v. Maybee, No. 11-30006, 2011WL 2784446, at *3 (W.DArk. July 15, 2011) (“Courts have held that a claim that the indictment fails to ‘charge an offense’ includes a claim that the statute creating the offense is unconstitutional.”), aff'd, 687 F.3d 1026 (8th Cir.2012); United States v. Thomas, 534 F.Supp.2d 912, 915 (N.D.Iowa 2008) (“It is settled that a claim that the indictment fails to state an offense under Rule 12(b)(3)(B) includes a claim that the statute creating the offense is unconstitutional.”) (internal quotation *80 marks and ellipses omitted), af'd sub nom. United States v. Howell, 552 F.3d 709 (8th Cir.2009); Moore’s Federal Practice § 612.04 (Lexis 2014) (“The defense of failure to charge an offense may be based on the absence of an essential element in the indictment, indefiniteness of allegations, the lack of a statute creating the crime, or the unconstitutionality of the statute relied upon.”).[10]
Finally, even if the issue had been forfeited and plain error review applied, the majority opinion still would possess discretion to decide the ex post facto issue under the first prong of the plain error test as defined by the Supreme Court and conclude that there was no “error” in the conspiracy conviction. See United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The majority opinion should do so. Courts have an appropriate role in times of war to decide certain justiciable disputes—but we should do so “with as much clarity and expedition as possible.” Kiyemba v. Obama, 561 F.3d 509, 522 (D.C.Cir.2009) (Kavanaugh, J., concurring). The majority opinion’s failure to decide the ex post facto question with respect to conspiracy does not comport with that principle, in my respectful view. Given the various pending cases raising the same question and the need for guidance in those wartime tribunals, I believe that the majority opinion should decide the issue.
On top of not deciding how the ex post facto principle applies to conspiracy trials before military commissions, the majority opinion also does not decide Bahlul’s Article I, jury trial, equal protection, or First Amendment challenges, but rather sends those four issues back to a three-judge panel for resolution. I also respectfully disagree with that approach. The remaining issues are not that complicated; we have the requisite briefing; and we could request supplemental briefing if need be. Moreover, those issues are especially easy to decide on plain error review, which after all is the standard of review that the majority opinion indicates must be applied to those issues. Sending the case back to a three-judge panel will delay final resolution of this case, likely until some point in 2015, given the time it will take for a decision by the three-judge panel and then resolution of any future petitions for panel rehearing or rehearing en banc. Like Judge Brown, I believe that we should resolve the case now, not send it back to the three-judge panel.
In short, I respectfully disagree with the majority opinion’s addressing the ex post facto issue in a way that does not actually decide the legal issue with respect to conspiracy and provides little clarity or guidance on that issue going forward, and also with its sending the other four issues back *81 to a three-judge panel. There is a time to avoid and a time to decide. Now is the time to decide.
In sum, I would affirm Bahlul’s conspiracy conviction, vacate the material support for terrorism and solicitation convictions as ex post facto violations, and remand to the U.S. Court of Military Commission Review for it to address the consequences, if any, for Bahlul’s life sentence.[11]

. So that there is no confusion as an historical matter and to be clear about the legal implications of the majority opinion, it is important to emphasize that the majority opinion’s analysis and vacatur of Bahlul's material support for terrorism conviction necessarily mean that Salim Hamdan’s material support for terrorism conviction likewise had to be vacated, which is what the Hamdan II panel did. In other words, the majority opinion relies on a slightly different rationale than did Hamdan II (the Ex Post Facto Clause itself rather than the 2006 Act as informed by the Ex Post Facto Clause), but the majority opinion reaches the same result: The offense of material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act.

. The ongoing global war against al Qaeda and its associated forces is overlapping but distinct, in law and in fact, from the war in Afghanistan against the former Taliban regime and Taliban forces. The potential end of the U.S. combat mission against Taliban forces in Afghanistan obviously does not mean the end of the global war against al Qaeda and its associated forces.

. As a general matter, the U.S. Constitution applies to U.S. citizens worldwide and to non-U.S. citizens within the 50 states and the District of Columbia, but not to non-U.S. citizens in foreign countries. See Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); United States v. Verdugo-Urquidez, 494 U.S. 259, 264-75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); id. at 275-78, 110 S.Ct. 1056 (Kennedy, J., concurring); Reid v. Covert, 354 U.S. 1, 5-14, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion); Johnson v. Eisentrager, 339 U.S. 763, 768-85, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).
A more nuanced issue is the reach of the Constitution to non-U.S. citizens in an in-between category: in territories owned or controlled by the United States, such as Puer-to Rico and Guam. Determining whether the Constitution applies to non-U.S. citizens in U.S. territories requires a "functional” rather than "formalistic” analysis of the particular constitutional provision and the particular territory at issue. Boumediene v. Bush, 553 *66 U.S. 723, 762, 764, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). The Court focuses on whether it would be "impracticable and anomalous" to extend the constitutional guarantee in question to non-U.S. citizens in the territory at issue. Id. at 759, 128 S.Ct. 2229 (quoting Reid v. Covert, 354 U.S. 1, 74, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, X, concurring)); see Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (Puerto Rico); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904) (U.S.occupied Philippines); Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903) (pre-statehood Hawaii).
In Boumediene, the Court determined that Guantanamo was de facto U.S. territory— akin to Puerto Rico, for example—and not foreign territory. See 553 U.S. at 769, 128 S.Ct. 2229 ("In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States.”); compare Eisentrager, 339 U.S. at 777-81, 70 S.Ct. 936 (habeas corpus right does not extend to U.S.controlled military prison in post-World War II Germany); Al Maqaleh v. Hagel, 738 F.3d 312, 317 (D.C.Cir.2013) (habeas corpus right does not extend to U.S. military base in wartime Afghanistan). The Court then determined that it would not be "impracticable or anomalous” to extend the habeas corpus right to non-U.S. citizen detainees at Guantanamo. See Boumediene, 553 U.S. at 769-71, 128 S.Ct. 2229. As the Government concedes, the Boumediene analysis leads inexorably to the conclusion that the ex post facto right applies at Guantanamo. It would be no more impracticable or anomalous to apply the Article I, Section 9 ex post facto right at Guantanamo than it is to apply the Article I, Section 9 habeas corpus right at Guantanamo.

. The precise text of Section 821 and its predecessor statutes has varied slightly over time, but the anti-deprivation language has been present in every iteration. See Pub.L. No. 64-242, 39 Stat. 619, 653 (1916) ("shall not be construed as depriving military commissions”); Pub.L. No. 66-242; 41 Stat. 759, 790 (1920) ("shall not be construed as depriving military commissions”); Pub.L. No. 81-506, 64 Stat. 107, 115 (1950) ("shall not be construed as depriving military commissions”); Pub.L. No. 84-1028, 70A Stat. 1, 44 (1956) ("do not deprive military commissions”).

. A passage in this Court's decision in Ham-dan II—a passage beginning "Third,” in the third-to-last paragraph of the opinion—suggested that the phrase "law of war” in Section 821 encompassed offenses under the international law of war but did not cover other offenses that were rooted only in U.S. military commission precedents. See Hamdan v. United States, 696 F.3d 1238, 1252 (D.C.Cir.2012) (Hamdan II). That statement was not necessary to the result in Hamdan II because, as the opinion explained, material support for terrorism was not an offense under the international law of war or under U.S. military commission precedents. See id. In any event, as the Deputy Solicitor General persuasively explained at oral argument, see Tr. of Oral Arg. at 15-20, that statement in Hamdan II was underinclusive. Given the text and textually stated purpose of Section 821, and the relevant Supreme Court precedents, the "law of war” prong of Section 821 covers both offenses under the international law of war and offenses sufficiently rooted in U.S. military commission precedents.

. It would be unconstitutional to apply any new offenses in the 2006 Act to pre-2006 conduct. In light of the canon of constitutional avoidance and Congress’s express statement in the text of the 2006 Act that the law did "not establish new crimes,” but rather merely codified "offenses that have traditionally been triable by military commissions,” I read the 2006 Act consistently with the Ex Post Facto Clause to authorize retroactive prosecution only of offenses that were already prohibited as war crimes triable by military commission under U.S. law at the time of the defendant's conduct. 10 U.S.C. § 950p(a) (2006); see Hamdan v. United States, 696 F.3d 1238, 1247 (D.C.Cir.2012) (Hamdan II); cf. Bond v. United States,-U.S.-, 134 S.Ct. 2077, 2087-90, 189 L.Ed.2d 1 (2014); Northwest Austin Municipal Utility District Number One v. Holder, 557 U.S. 193, 205, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009); Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J., concurring) ("as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.”). The majority opinion disagrees that the 2006 Act can be read to incorporate ex post facto principles, even in light of the constitutional avoidance canon. I do not think the majority opinion is correct about that. But that does not matter in this case. Whether it is because of the Act as construed in light of the Ex Post Facto Clause or because of the Ex Post Facto Clause itself (or both), military commissions at Guantanamo may not prosecute any new offenses in the 2006 Act for pre-2006 conduct. The key question is which offenses in the 2006 Act are new.

. For purposes of Bahlul’s jury trial, equal protection, and First Amendment arguments, I will assume for the sake of argument that those constitutional protections apply to non-U.S.-citizens at Guantanamo. See supra note 3; Kiyemba v. Obama, 561 F.3d 509, 518 n. 4 (D.C.Cir.2009) (Kavanaugh, J., concurring) (similarly assuming for sake of argument that Due Process Clause applies to Guantanamo). Even so, as I will explain, Bahlul's arguments are unavailing.

. Judge Henderson’s concurrence, which speaks only for her, notes quite correctly that the majority opinion today overrules Hamdan II's reliance on the 2006 Act (as opposed to the Ex Post Facto Clause) as a basis for concluding that material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act. What Judge Henderson does not say in her concurrence is this indisputable fact: Based on the Ex Post Facto Clause, the majority opinion today reaches the same result as Hamdan II by concluding that material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act, which in turn means that Salim Hamdan’s material support for terrorism conviction was properly overturned by this Court in Hamdan II.

. Rules 905 and 907 are entitled "waiver” but those Rules, like the other Rules of Military Commissions, use that term (imprecisely) to cover both waived arguments and forfeited arguments. See Manual for Military Commissions pt. II, at 11-83-84, 11-87 (2007); Manual for Military Commissions pt. II, at 11—89— 91, 11-95 (2012); see also Rules 920(f), 1005(f), 1106(e)(6), Manual For Military Commissions pt. II, at 11-115, 11-125, 11-145 (2007).

. Notably, the Advisory Committee on the Federal Rules of Criminal Procedure has recently recommended changing this aspect of Rule 12(b)(3)(B), apparently because it is somewhat too lenient. Under the proposed change, the argument that a charge failed to state an offense would no longer be an exception to the usual rules governing waiver and forfeiture. In other words, a defendant would no longer be able to raise an argument that the charge failed to state an offense for the first time on appeal and still receive de novo review of that claim. See Summary of the Report of the Judicial Conference Committee on Rules of Practice and Procedure, Rules Appendix C-15-C-26 (Sept.2013). But that proposed rule change, which has not yet taken effect, just highlights what the "fails to state an offense” language means now in the Criminal Rules. And that is the same language that the Rules of Military Commissions uses. Unless and until the Rules of Military Commissions are likewise changed, therefore, an argument that a military commission charge failed to state an offense—such as the Ex Post Facto Clause argument here—may be raised for the first time on appeal and receive de novo review.

. The Supreme Court in Quinn affirmed the Nazi saboteurs’ convictions and sentences on one charge and declined to review their convictions on the remaining charges. See Ex parte Quirin, 317 U.S. 1, 46, 63 S.Ct. 2, 87 L.Ed. 3 (1942). That approach reflected the practice at the time for American appellate review of criminal convictions. The modern American appellate practice, however, is to address each conviction separately in these circumstances. See Rutledge v. United States, 517 U.S. 292, 301-03, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996); Ray v. United States, 481 U.S. 736, 736-37, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987). Absent contrary indication, I assume that Congress intended appellate review under the Military Commissions Acts of 2006 and 2009 to proceed in the same manner as modern appellate review of multiple criminal convictions. For that reason and because a sentence was not specified for each individual offense in this case, I have addressed the material support for terrorism and solicitation offenses as well as the conspiracy offense.